Marion **ROSETTE**, Plaintiff,

v.

**RAINBO RECORD MANUFACTURING CORPORATION et al.,**
Defendants.

No. 66 Civ. 3864.

United States District Court,
S. D. New York.

Feb. 26, 1973.

Zissu, Marcus & Stein, New York City, for plaintiff.

Hofer, Rich & Grubman, New York City, for defendants.

GURFEIN, District Judge.

The plaintiff in this action is the composer of children's songs which were either adapted by her from classic children's nursery rhymes or were original compositions. In her 42 count complaint she charges that the defendants infringed her copyrights by manufacturing and selling records containing thir-

ty-three (33) compositions. Thirty-three counts are premised on statutory copyright claims; the remaining nine (Counts 19, 26, 28, 30, 32, 34, 36, 38 and 40) charge common law copyright infringements. Jurisdiction is alleged generally under 17 U.S.C. § 1 et seq. and under 28 U.S.C. § 1338(b). The plaintiff seeks injunctive and monetary relief, including treble damages and attorneys' fees.

The defendants deny that they have infringed the plaintiff's alleged statutory or common law copyright as set forth in the complaint. The defendants further contend, *inter alia,* that they are not proper defendants in this suit since Rainbo was merely a record presser and not a "manufacturer" within the meaning of 17 U.S.C. § 1(e).

The defendants seek dismissal of twenty counts on the ground of prior publication.[1] Nine of these are the common law counts and eleven are statutory copyright claims. Dismissal is sought of two counts, 41 and 42, on the ground that the plaintiff has failed to show ownership of the copyrights involved. The remaining eleven counts and all the other counts as well are said to be time barred by limitation and because the plaintiff allegedly failed to file notices of use until after the alleged infringements had occurred.

A trial was held to the Court on October 10–11, 1972.

## FACTS

The plaintiff is a graduate of the Peabody Conservatory and a member of ASCAP. In 1949 she formed Lincoln Records Co., a corporation wholly owned by herself and her husband. The plaintiff testified at the trial and was the only witness on her behalf. Mrs. Rosette is the composer of the thirty-three

compositions here at issue. The schedule showing the count of the complaint, the date of the copyright, the first recording date and the filing date of notice of use is set forth in the margin.[2]

## THE DEFENSE OF PRIOR PUBLICATION

The plaintiff admitted in her testimony that the compositions Chicken Licken (count 13); Pussy Cat, Pussy Cat (counts 18 and 19); Jack and the Beanstalk (count 23); Pinocchio (counts 25 and 26); Mary had a Little Lamb (counts 27 and 28); Ding Dong Bell (counts 29 and 30); Fiddle Dee Dee (counts 31 and 32); Goosy Goosy Gander (counts 33 and 34); Where has my Little Dog Gone (counts 35 and 36); Alice in Wonderland (counts 37 and 38); and Old King Cole (counts 39 and 40) were recorded, manufactured and continuously sold by the plaintiff and her company for many years before the plaintiff or her company obtained a statutory copyright of the compositions. Phonograph records of Chicken Licken and Jack and the Beanstalk were sold to the general public approximately one and one-half years before the date on which the copyrights were obtained, and the copyrights for Pinocchio, Mary had a Little Lamb, Ding Dong Bell, Fiddle Dee Dee, Goosy Goosy Gander, Where has my Little Dog Gone, Alice in Wonderland and Old King Cole, were obtained between ten and thirteen years after the recordings of these compositions were sold throughout the United States by the plaintiff and her companies. As to the other compositions whose recording date she recalled, the plaintiff testified that the recordings were not released until after the copyright registration had been secured. With respect to the compositions Old Mother Hubbard (count 5), Hobbledy Horse (count 8), The Weez

---

1. 13, 18, 19, 23, 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 38, 39 and 40. The plaintiff concedes prior publication as to eighteen of these counts, contesting only counts 13 and 23 as to which she claims that no recording was released prior to

registration. Because the defendants have failed to offer any proof of prior publication on counts 13 and 23, I find for the plaintiff on this matter.

2. The full schedule is omitted from the published text.

Wump (count 14), The Pied Piper (count 15) and Little Red Hen (count 20), she could not recall the dates of recording but she believed that there could have been no prior publication of these compositions since it was her practice to register her compositions prior to their release on phonograph records. The defendants introduced no proof of prior sale of phonograph records with respect to any of the counts except those conceded by the plaintiff in her own testimony.

## THE ALLEGED INFRINGEMENT

The plaintiff introduced into evidence fourteen long playing records and testified that she had purchased them about December 1964, give or take one year. According to Mrs. Rosette the Playtime Albums numbered 106, 107, 108, 109, 111, 112, 116, 117 and 118 and the Carousel Albums numbered 806, 807, 808 and 812 contained exact duplications of her compositions which are the subject of this action and were in fact the same mechanical reproductions which she had authorized earlier. She testified that the names of the songs on these albums had been varied slightly in some cases.

The plaintiff also introduced the Schwann Long Playing Record Catalog for 1964 which enters records "only on authority of written or printed information sent to us by the manufacturer." That catalog listed for sale the Playtime albums numbered 106, 107, 108, 109, 111 and 112 referred to above.

The defendant Jack Brown is President of the defendant Rainbo Record Manufacturing Corporation. Together with the defendant Harold Markowitz he had formed the partnership Rainbo Record Company, also a defendant. Brown was the sole witness called by the defendants.

Brown testified that the Rainbo partnership was dissolved in the late 1940s and that he and Markowitz have not conducted business since that time. The Rainbo Company, the partnership, was engaged in a business different from that of Rainbo Manufacturing Corporation. There is no evidence linking Markowitz or the partnership to the alleged acts of infringement.

Rainbo Record Manufacturing Corporation (hereinafter "Rainbo") was engaged in the business of pressing records. Among its customers was Sidney Taback who did business under the name of Lyric Records. Lyric Records had previously been a partnership consisting of Mr. Brown, Mr. Taback and Selig J. Smith. The partnership was dissolved in February 1963 but Taback continued using the name Lyric.

Brown testified that Lyric and Rainbo were not related companies and that neither he nor Rainbo had any interest in the records pressed for Taback. He related that Lyric supplied Rainbo with the metal components, labels and jackets for the pressing of albums done by Rainbo for Lyric, and that upon completion of the order Taback would retrieve the stamping parts, occasionally even picking them up in person.

The plaintiff established that during the years 1962, 1963, 1964, 1965 and 1966 Rainbo and Lyric (or Playtime-Lyric) shared the same telephone numbers and were listed in the Los Angeles telephone directory as having the same address. In 1963 Brown had moved his place of business from Laundale, California to North Las Palmas in Hollywood; and the telephone directory indicates that Lyric also moved that same year to the same address and telephone number. The plaintiff also introduced into evidence a letter addressed by the plaintiff's attorney to "Playtime Records Inc." dated May 17, 1966 (Ex. 14) making a claim of infringement of the compositions in suit and listing the offending albums as bearing the names "Carousel" and "Playtime." A return receipt was requested. A return receipt was signed "J. G. Brown" dated May 19, 1966. Though Brown refused to acknowledge that the signature on the return receipt was his, he did admit answering the letter from the plaintiff's

attorney. His reply dated June 16, 1966 was written on the letterhead of Rainbo Records (the very addressee of the letter) and it was signed "Jack G. Brown."

The plaintiff contends that this reply to plaintiff's infringement claims constitutes an admission by Brown that Rainbo was related to Lyric, Carousel and Playtime Records and that, in fact, Rainbo had purchased the Carousel and Playtime line of songs from Lyric. The letter reads:

"This is to advise you that the Carousel and Playtime Record line has been inactive for two years.

We may reactivate the line through Ed Chaplin of PPX, with whom I am sure you are familiar.

We would like to see your contracts regarding the works you refer to inasmuch as we have a 'hold harmless' agreement when we purchased the entire catalogue."

The defendants deny that the letter constitutes an admission because many of the plaintiff's copyrighted songs bear titles of classic children's nursery rhymes and while the plaintiff obtained copyrights to her songs because of her adaptation, arrangement and lyrics, others had the right to the same titles with different musical compositions. In sum, it is contended that Brown could not determine which were the plaintiff's compositions without actually listening to them in any event, and since he had not listened to the plaintiff's recordings he could not have made an admission that the recordings in the Carousel and Playtime albums were the same.

I find the explanation a bit disingenuous. The explanation does not satisfactorily rebut the circumstantial evidence showing the common control of Lyric or Playtime-Lyric and Rainbo. Nor does it rebut the inference that Brown, i. e. Rainbo, could reactivate "the Carousel and Playtime Record line" whenever he felt like doing so. The further admission in the Rainbo letter that "*we* have a 'hold harmless' agreement when *we*

purchased the entire catalogue" (emphasis supplied) assumes the responsibility for infringement if it exists and incidentally belies the claim now asserted that Rainbo was only a "presser" of records, not a manufacturer or a distributor. In the light of the circumstantial evidence I cannot credit Brown's unsupported testimony that Rainbo was only a "presser," that the only record containing the plaintiff's compositions was Playtime Album 106, and that the Playtime and Carousel record line were only pressed to the middle of 1960.

His letter of June 16, 1966 speaks of the Carousel and Playtime record line as having been "inactive for two years," i. e. since the middle of 1964. His knowledge of when the Carousel and Playtime record line became inactive is evidence of a more intimate knowledge that Brown now admits. And the juxtaposition of the extrapolated date of 1964 in the letter and the testimony of Mrs. Rosette is of some significance. She put in evidence fourteen long playing records (Exs. 11 and 11a) and testified that Playtime record 112 (Ex. 11a) was purchased by her on December 22, 1964, the sales slip of Liberty Records being Exhibit 12. The thirteen phonograph records which constitute Exhibit 11 were all purchased within six months to a year earlier. The Schwann Long Playing Record Catalog for December 1964 lists as available for sale Playtime Albums Nos. 112, 101, 109, 105, 107, 106, 111, 104 and 108 in that order.

The plaintiff testified that she listened to each of the fourteen records she had purchased, compared them with her compositions and found that each embodies exact duplications of her compositions in the exact mechanical reproductions she had authorized. She testified that in some instances the titles had been slightly changed on the infringing albums. I credit her testimony.

Although Brown based his failure to present books in support of his "pressing" activities on flood damage, he

failed to assert that reason when his deposition was taken on August 26, 1969.[3]

■ I find as a fact that there was infringement by the defendants Rainbo and Brown of the plaintiff's compositions which are the subject of suit.

Despite Brown's testimony, I find that Rainbo was in fact the presser of the records containing the allegedly infringing compositions; that Rainbo did purchase the Carousel and Playtime catalogs; that Rainbo and Lyric were closely related; that the two corporations shared the same mailing address and telephone number and conducted business through such shared address; and that Rainbo and Lyric did act in concert in the conduct of business.

The defendants raise an important issue, however, which has intrigued the law professors: whether the distribution of phonograph records without copyright registration is a publication that results in a loss of the common law copyright in the unpublished composition and is a dedication of the musical composition to the public.

Under the Copyright Law when a copyrighted work is reproduced mechanically it is protected, 17 U.S.C. § 1(e), and unauthorized manufacture, sale or use constitutes infringement of the copyright (17 U.S.C. § 101(e)). The Copyright Law also saves to the author or proprietor of an *unpublished* work the right, at common law or in equity, to prevent the copying, publication or use of such unpublished work without his consent and to obtain damages therefor (17 U.S.C. § 2).

■ The effect of the Copyright Act is "to secure to the author of a copyrighted play the sole right to its performance after it had been printed" Ferris v. Frohman, 223 U.S. 424, 435, 32 S.Ct. 263, 266, 56 L.Ed. 492 (1912). This applies to a musical composition as well. See Kaplan, Publication in Copyright Law, 103 U.Pa.L.Rev. 469, 473 (1955).

Thus, so long as the work is unpublished the author retains common law rights in the composition, including the sole right of its performance. On the other hand, if the author chooses to publish the work without meeting the requirements for statutory copyright he will lose his common law protection. See National Comics Publication v. Fawcett Publications, 191 F.2d 594 (2 Cir. 1951).

■■ Here the plaintiff did not publish some of her musical compositions as sheet music for sale to the public. She kept some of her musical manuscript in unpublished form but she, nevertheless, authorized the mechanical reproduction of such unpublished compositions on phonograph records. If she had lent an original manuscript to an orchestra for performance without publishing it as sheet music she would have retained her common law rights. See Mills Music v. Cromwell Music, 126 F.Supp. 54 (S.D. N.Y.1954); Patterson v. Century Productions, 93 F.2d 489 (2 Cir. 1937). If she had published her composition as sheet music without getting statutory copyright protection she would have lost her rights in its performance. The question is whether the mechanical reproduction on a phonograph record of an otherwise *unpublished* composition itself constitutes publication so as to divest the author of common law rights.

The plaintiff contends that it is not publication but *performance* of an unpublished work. The defendants argue that the phonograph record is a copy of the composition and is also a publication because it is perpetuated and is not ephemeral like a stage performance.

On this modern version of a scholastic dialogue the law professors enjoy the disputation, but the judicial process must resolve the dispute one way or the other. See, e. g., Kaplan, *supra*; Nimmer on Copyright §§ 50.1–50.2; also Tannenbaum, "Practical Problems in Copyright" in seven Copyright Problems Analyzed (CCH 1952); Schulman,

3. Taback died in 1964.

"Authors' Rights" *Id.* at 19; Burton, "Business Practices in the Copyright Field," *Id.* at 87.

The familiar tools of statutory construction, of precedent and its *ratio decidendi*, of the weight to be accorded *stare decisis* and of the vaguer notions of public interest in the face of claims to monopolize, all come into play. On the one hand there is distaste for the perpetual monopoly that sustaining common law rights unlimited in time involves. On the other, there is a strong reaction that precedent should be reliable rather than a trap for the unwary, particularly in a technical field where the lawyers, assumed to be learned, guide the hand of the untutored artist.

It may be noted, incidentally, that the Universal Copyright Convention (UCC) to which the United States is a party has clearly eliminated mechanical production on phonograph records as "publication." The Convention in Article VI defines publication as "the reproduction in tangible form and the general distribution to the public of copies of a work from which it can be read or otherwise visually perceived." Curiously the definition was reached not so much on a theoretical basis as on the belief shared by the conference "that according to the United States law the issuance of phonograph records does not amount to publication, and that an unpublished work remains unpublished. . . ." It was believed that a contrary provision in the Convention would require an amendment of the United States Copyright Law unlikely to be accepted by Congress. Bogsch, Universal Copyright Convention, 83 (1958). Three of the four American delegates to the Conference in 1952 who participated in the drafting of the Convention are said to have stated the view that the sale of records is not a publication of the musical work involved.[4] And the practicing copyright bar has voiced its objection to relinquishing what they consider *stare decisis* so as to cast into the public domain thousands of works of popular and classical music, performances of which have been distributed on phonograph records without statutory copyright in reliance upon the rule of law that a distribution of phonograph records is not a publication.[5]

The distinction between sheet music, a literal copy of the original manuscript, and a mechanical reproduction of a musical composition originally came before the Supreme Court in the famous case of White-Smith Music Publishing Co. v. Apollo Co., 209 U.S. 1, 28 S.Ct. 319, 52 L.Ed. 655 (1908). There the Court held that a music roll for mechanical pianos did not constitute a "copy" of the recorded music and hence was not an infringement of it. From this result it was logical to conclude that if the infringing music roll was not a copy of the composition so as to cast its maker in liability, the creation of a music roll by the author himself would not make it a "copy" of his work and hence not a publication of it. The *White-Smith* result can also be rationalized as an opinion that mechanical reproduction is performance, like live performance, and is, therefore, not publication. The Court noted: "As the Act of Congress now stands we believe it does not include these records as copies or *publications* of the copyrighted music involved in these cases." 209 U.S. at 18, 28 S.Ct. at 323 (emphasis supplied). The Ninth Circuit in Corcoran v. Montgomery Ward & Co., 121 F.2d 572 (9 Cir. 1941) seems to

4. Arthur E. Farmer, "Report to Section of Patent, Trademark and Copyright Law of American Bar Association," September 15, 1952, at p. 11;

John Schulman, "A Realistic Treaty," The American Writer, Vol. 1, No. 218, at p. 23 (November, 1952);

Sydney M. Kaye, "Duration of Copyright and the Concept of Dedication,"

Bulletin of the Copyright Society of the U. S. A., Vol. 2, No. 4, p. 93 at pp. 95–96 (February, 1955).

5. Tannenbaum, *supra*; Schulman, *supra*; McDonald, "The Law of Broadcasting," *Id.* at 31; Burton, *supra*.

have specifically extended the *White-Smith* rule to phonograph records.

The Copyright Act was completely revised in 1909.

■ The impact of the *White-Smith* case was limited by the statutory provision in the 1909 Act that "[c]opyright may also be had of the works of an author, of which copies are not reproduced for sale, by the deposit, with claim of copyright, of one complete copy of such work if it be a lecture or similar production or a dramatic, musical, or dramatico-musical composition" (formerly Section 11 of the 1909 Act), 17 U.S.C. § 12. Thus, copyright protection was made available for *unpublished* musical compositions. And the sale of records of a musical composition registered under Section 11 of the Copyright Act will not terminate its copyright protection, Yacaubian v. Carroll, 74 U.S.P.Q. 257 (S. D.Cal.1947) against unauthorized phonograph records. Shilkret v. Musicraft Records, 131 F.2d 929 (2 Cir. 1942). But the Court of Appeals has not yet had occasion to consider the protection of unpublished musical compositions which rely on *common law rights* against unauthorized phonograph records. Section 2 of the Copyright Act recognizes the continued validity of common law rights in an "unpublished work" and confirms the right of an author to prevent "[the] use of such unpublished work."

The 1909 Act was a comprehensive revision of the Copyright Law. As we have seen, the Supreme Court in *White-Smith* had previously ruled that the recordation of a musical composition by mechanical means did not make the record (piano roll) a "copy" of the composition. The drafters of the 1909 Act stated that "it is not the intention of the committee to extend the right of copyright to the mechanical reproductions themselves, but only to give the .composer or copyright proprietor the control, in

accordance with the provisions of the bill, of the manufacture and use of such devices." House Reports, 60th Cong.2d Sess.Vol. 1 (1909), p. 9. The provisions of the bill referred to included the now familiar compulsory licensing provision whereunder the payment of a royalty of two cents per record anyone may use the copyrighted composition (§ 1(e)). The assumption remained, however, that the musical composition itself was a thing apart from its performance on a phonograph record.

In this light the Act provided for two different protections for the unpublished musical composition itself. First, a new statutory method of copyright was provided in Section 11 for *unpublished* works and second, common law rights were preserved in *unpublished* works. It has been held, however, that an author is not compelled to resort to a Section 11 copyright to avoid forfeiture of his common law rights. Nutt v. National Institute Inc. for the Imp. of Memory, 31 F.2d 236 (2 Cir. 1929).

■ While that is true of the author of an unpublished manuscript it does not follow that it is also necessarily true of a composer of an unpublished composition who has chosen to make and sell phonograph records for which special provision has been made in the Copyright Act.

■ The Copyright Act does not define publication and it is true that generally a performance of an unpublished musical manuscript is not a publication. *Frohman, supra.* This accords with the expressed view of· the Copyright Bar and the music industry that making a record of an unpublished composition is not a "publication." Their reliance is on accepted doctrines of copyright law.

It is small wonder then that a brief opinion by Judge Igoe in Shapiro, Bernstein & Co. v. Miracle Record Co., 91 F. Supp. 473 (N.D.Ill.1950) raised the hackles of the Copyright Bar.[6] Judge Igoe,

---

6. The lament was loud and clear. Joseph A. McDonald in his lecture on "The Law of Broadcasting" in 7 Copyright Problems Analyzed, *supra*, at 46 relates: "I was quite cast down about that, and in all the beaneries where the copyright bar

by way of dictum, expressed the view that the composer "abandoned his rights, if any, to a copyright by permitting his composition to be produced on phonograph records and sold some time before copyright" (91 F.Supp. at 475). Judge Igoe apparently rejected the view that "a record is nothing but a captured performance of the composition," see Kaplan, *supra,* at 480 and he made no mention of *White-Smith, supra.*[7]

In Mills Music v. Cromwell Music, 126 F.Supp. 54, 69–70 (S.D.N.Y.1954) Judge Leibell considered a defense that plaintiff's assignors had "waived all rights in the musical composition and dedicated it to the public" (*Id.* at 57). Judge Leibell found that there was no such authorized manufacture and sale of records of "Tzena" by the plaintiff's assignors (*Id.* at 70). By way of dictum, however, he expressed the view that "[t]he manufacture and sale of phonograph records in this country by a person or corporation duly authorized by Miron would have constituted a publication of his composition" (*Id.* at 69).

In McIntyre v. Double A-Music Corporation, 166 F.Supp. 681, 683 (S.D.Cal. 1958) Judge Solomon found that the plaintiff's arrangement of a musical composition "was insufficient to qualify for either a common-law or a statutory copyright." By way of dictum, Judge Solomon expressed the view that the sale to the general public of hundreds of thousands of phonograph records of his arrangement "was a general publication of plaintiff's arrangement and destroyed whatever rights he had in the arrangement under the common law of copyrights." (*Id.* at 682).

None of the distinguished judges cited made any reference to *White-Smith* or

the impact of the 1909 Act on its doctrine.

In this District, Judge Cooper has expressed a contrary view, also by way of dictum, that "a phonograph record is not a copy of a musical composition . . . nor is a sale of the record a 'publication' of the underlying composition." Nom Music, Inc. v. Kaslin, 227 F.Supp. 922, 926 (S.D.N.Y.1964), aff'd on other grounds, 343 F.2d 198 (2 Cir. 1965).

This leaves us with the conviction that higher judicial authority has not passed directly on the point. It has remained since 1909 a bone of contention between the Copyright Bar and some of the law professors.

Section 2 of the Copyright Act was reenacted at the same time that phonograph recordings were themselves a current subject of debate. It would have been simple to carve out an exception to the protection of unpublished musical compositions for the production and sale of phonograph records otherwise covered by Section 1 and Section 11. This was not done.

The questions nevertheless confront us (1) whether the 1909 Act overruled *White-Smith* and made a phonograph record a "copy" or a "publication," and (2) whether the special statutory scheme involving phonograph records is a gloss on the scope of Section 2 of the Act.

With regard to the first question it is difficult to rationalize accepted principles of copyright law to make performance of a composition a publication of the composition itself. The argument that the permanency of the recording makes it more than a mere performance is an argument that the Congress did

---

eats, you could overhear remarks such as 'Have you heard what Judge Igoe did? What can we do? Someone ought to try for a rehearing.' Et cetera, et cetera."

7. The Second Circuit in RCA Mfg. Co., Inc. v. Whiteman, 114 F.2d 86, cert. denied, 311 U.S. 712, 61 S.Ct. 393, 85 L.Ed. 463

(2 Cir. 1940) and Capitol Records, Inc. v. Mercury Records Corp., 221 F.2d 657 (2 Cir. 1955) dealt with *performer's* rights in phonograph records where the musical composition was not owned by the performer. That is a different question and does not deal with "publication" of an unpublished musical composition.

not accept or it could easily have made such an enactment. And the Copyright Office had held that the phonograph record itself may not be registered under Section 11. C.F.R. 202.8(b).[8]

■ The difficult second question still remains. The common law right in the unpublished composition makes no requirement of notice of use of the musical composition on phonograph records by the composer or the copyright owner as is required under Section 1(e) where a statutory copyright has been obtained. This puts the statutory copyright owner at an apparent disadvantage, for if the statutory copyright owner fails to file his notice in the Copyright Office "any failure to file such notice shall be a complete defense to any suit, action or proceeding for any infringement of such copyright." (§ 1(e)). Can the States, by virtue of the common law, constitutionally impose a lesser requirement when copyright has been vested by the Constitution in the national Government? Must the impediments to the free exercise of the *statutory* copyright be held to limit the exploitation of the common law copyright to the same degree? A statutory construction that avoids a constitutional problem is desirable.

Judge Learned Hand, dissenting in *Capitol Records, supra,* had expressed misgivings about the power of the States "to follow their own notions as to when an author's right shall be unlimited both in *user* and in duration." 221 F. 2d at 667 (emphasis supplied). Judge Hand's prophecy of 1955 became law in 1964 when the *Sears-Compco* doctrine was announced by the Supreme Court. In Sears, Roebuck & Co. v. Stiffel Company, 376 U.S. 225, 84 S.Ct. 784, 11 L.Ed.

2d 661, and in Compco Corp. v. Day-Brite Lighting, Inc., 376 U.S. 234, 84 S.Ct. 779, 11 L.Ed.2d 669 (1964), the Court held that a State may not prohibit the *copying of an article* unprotected under the Federal patent laws. Justice Black, relying on the Supremacy Clause stated, "Just as a State cannot encroach upon the federal patent laws directly, it cannot, under some other law, such as that forbidding unfair competition, give protection of a kind that clashes with the objectives of the federal patent laws." 376 U.S. at 231, 84 S.Ct. at 789.

One might still have supposed that copyright law is different from patent law because Section 2 of the Copyright Act specifically recognizes common law rights which are State created rights. But the distinction is apparently not to be made. For Justice Black in the *Compco* case made it explicit that "Today we have held in Sears, Roebuck & Co. v. Stiffel Co., *supra,* that when an article is unprotected by a patent *or a copyright,* state law may not forbid others to copy that article. To forbid copying would interfere with the federal policy, found in Art. I, § 8, cl. 8, of the Constitution and in implementing federal statutes, of allowing free access to copy whatever the federal patent *and copyright* laws leave in the public domain." 376 U.S. at 237, 84 S.Ct. at 782 (emphasis supplied).

■ The failure of a copyright owner to file his notice of use in effect puts his composition into the public domain —at least from the time of use to the date of filing. Norbay Music, Inc. v. King Records, Inc., 290 F.2d 617 (2 Cir. 1961). *Cf.* Biltmore Music Corp. v. Kittinger, 238 F.2d 373 (9 Cir. 1956). During such time it would seem that

---

8. While copyright registration by publication with notice of copyright (§ 10) requires the prompt deposit in the Copyright Office of two complete copies of the best edition, the Copyright Office Rules provided that "[a] phonograph record or other sound recording is not considered a copy of the compositions recorded on it, and is not acceptable for copyright registration."

Rules and Regulations of the Copyright Office, 37 C.F.R. 202.8(b). A phonograph record is not a copy of the musical composition itself. But note that the Copyright Act was amended on October 15, 1971 to provide that sound recordings may now qualify for copyright protection. Pub.L. 92–140, 85 Stat. 391.

granting protective rights under State law would be inconsistent with the Congressional policy of requiring notice by copyright owners to would-be users so that they in turn may protect themselves under the two-cent royalty provision by paying the royalty to the copyright owner (§§ 1(e), 101(e)).

To avoid the constitutional problem I think that the exception of Section 2 of the Copyright Law must be limited to exclude the sale of phonograph records from the protection given to the owner of an unpublished manuscript to the extent that the common law right exceeds the rights of statutory copyright owners. The conditions for use of the musical composition on phonograph records are so well defined in the comprehensive Copyright Act of 1909 that it is unlikely that the Congress intended that contradictory principles of State law should survive.[9]

This leads to the conclusion that the use of phonograph records without compliance with the Copyright Act bars claims for infringement not because the record is a "copy" or a "publication," but because any other interpretation leads to conflict with the Federal statutory scheme. Section 2 would still be read as applying to unpublished works protectible at common law including unpublished musical compositions where no mechanical recordings have been made.

On the other hand the failure to file notice of use does not bar the copyright owner forever, *Norbay, supra.* By analogy then I hold that the sale of phonograph records is not a divestment of common law rights by publication but that it does inhibit suit against infringers until the statutory copyright is obtained and the notice of use is filed. Thereafter, applying the rule of *Norbay,* the statutory copyright owner may sue for subsequent infringement. This provides an accommodation to basic copyright *stare decisis* in preventing the loss of rights in the "unpublished" composition by an unintended dedication to the public while preserving the supremacy of the Federal copyright law and effecting its policy.

Applying this ruling to the facts, I find that the plaintiff may recover but only from the dates of her filing the respective notices of use.

## OWNERSHIP OF THE COPYRIGHTS

The authorship, originality and copyrightability of the compositions are undisputed. The plaintiff has introduced the copyright certificates for all thirty-three compositions in question and has thereby made out a prima facie case of the facts stated therein, 17 U.S.C. § 209. The defendants claim, however, that Mrs. Rosette is not the proprietor of the copyrights which are the subject of Counts 41 and 42, namely, Mother Goose Party and Katie the Kangaroo.

The copyright certificates indicate that Peer International Corp. and Paull-Pioneer Music Corp. were the original copyright claimants for Mother Goose Party and Katie the Kangaroo, respectively. On July 26, 1955 Peer International reassigned to Lincoln records "all rights to Mother Goose Party subject to our ownership hereto." Lincoln had al-

9. Professor Nimmer has suggested a more complete divestment of the common law rights upon grounds with which I do not agree as appears from this opinion. His consideration of the *Sears-Compco* doctrine in relation to the problem at hand is, however, provocative and novel. See Nimmer, *supra,* § 59. His discussion of the effect of the 1971 Amendment to the Copyright Act, (Pub.L.No.92–140, 85 Stat. 391; 17 U.S.C. §§ 1, 5, 19, 20, 26, 101) on the *Sears-Compco* doctrine is interesting as well. Nimmer, *Id.* § 35.225. I incline to the view that Congress in the Sound Recording Amendment was concerned with *performance* on phonograph records and not with the musical composition itself as an unpublished work under State law. "The copyrighted work" is the "sound recording"—17 U.S.C. § 1(f) and the proviso that the Amended Copyright Act shall not be applied retroactively refers only to "sound recordings," i. e. the *performance* of musical works rather than the unpublished musical work. Pub.L. 92–140, 85 Stat. 392 § 3.

ready assigned "our right, title and interest in and to the copyrights and all other rights we may have in" Mother Goose Party (along with 49 other compositions) to Mrs. Rosette on October 23, 1951. The defendants present two arguments. First, that since Peer's reassignment was "subject to our ownership hereto" Peer remained the copyright owner and no assignment of Mother Goose Party was ever effected. Second, because Lincoln's assignment of Mother Goose Party preceded Peer's reassignment to Lincoln of the copyright to that composition, plaintiff never became the proprietor of the copyright.

The defendants misconstrue the contracts in question. By conditioning the assignment "subject to our ownership hereto," Peer did not intend to retain prospective ownership rights, but merely reserved its right on any copies which may have been previously published without incurring liability. "Hereto" simply meant "heretofore." Moreover, Lincoln's 1951 assignment to Mrs. Rosette conveyed to Mrs. Rosette the interest in the copyright of Mother Goose Party which Lincoln acquired upon the reassignment in 1955 by Peer. The intent of the parties was clearly to transfer whatever title Lincoln may have or may acquire. This is particularly evident in light of the fact that Mrs. Rosette and her husband were the owners of Lincoln Records and that Mrs. Rosette, in return for the copyright assignments, granted to Lincoln Records in 1951 "the non-exclusive, irrevocable right and license to reproduce" her compositions.

As to count 42, the defendants state that evidence of the reassignment of Katie the Kangaroo by Shawnee Press to Mrs. Rosette on August 31, 1960 was insufficient to establish ownership of that copyright since Paull-Pioneer, not Shawnee, was the original copyright registrant. At the trial decision was reserved on the admissibility of the Shawnee letter. It will be accepted in evidence. That document expressly states that Shawnee acquired this copyright by assignment from Paull-Pioneer. It was not necessary for the plaintiff to introduce in addition the document constituting the assignment from Paull-Pioneer to Shawnee. Absent any proof to the contrary, the plaintiff has established by a preponderance of the evidence that she is the copyright proprietor of Katie the Kangaroo, the subject of count 42 of the complaint.

The plaintiff's ownership of the thirty-one remaining copyrights is not challenged.

## STATUTE OF LIMITATIONS

██ Since I have held that the only recovery that can be had is on the statutory copyrights (including the common law copyrights that were later registered) the statute of limitations provided in the Copyright Act applies. That statute provides that no action may be maintained "unless the same is commenced within three years after the claim accrued" (17 U.S.C. § 115(b)).

This litigation was commenced on November 15, 1966. The date of accrual is the date of filing the notice of use. The earliest notice of use filed by the plaintiff is January 25, 1961 and the latest February 9, 1965. Any infringement more than three years before the commencement of the action (November 15, 1963) is barred by limitation, as is any infringement prior to filing a notice of use as decided herein.

Accordingly, the defendants Rainbo Record Manufacturing Corporation and Jack Brown will account for the period not time-barred either by limitation or failure to file notice of use with respect to each record sold of a copyrighted composition of the plaintiff under the labels of Carousel and Playtime. Upon such accounting the defendants will pay to the plaintiff a royalty of two cents per record sold and a further sum of three times thereof.

The foregoing constitutes the findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).

A Master will be appointed to preside over the accounting unless the parties can agree to a stipulated sum twenty-one days from the date hereof. No costs are awarded at this time.

Submit judgment on notice.