ABKCO MUSIC, INC., Plaintiff-
counter-defendant-Appellee,

v.

Stephen LAVERE, as an individual, dba
King of Spades Music; Delta Haze,
Inc., in its corporate capacity, dba
King of Spades Music; Mimosa Rec-
ords Productions, Inc., in its corporate
capacity, dba King of Spades Music,
Defendants-counter-claimants-Appel-
lants.

No. 98–56145.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Feb. 8, 2000

Filed June 26, 2000

Anthony Kornarens, Kornarens & Howard, Los Angeles, California, for the defendants-counter-claimants-appellants.

Donald S. Zakarin (argued), Pryor, Cashman, Sherman, & Flynn, New York, New York, and Max J. Sprecher, Lavely & Singer, Los Angeles, California, for the plaintiff-counter-defendant-appellee.

Before: RYMER and FISHER, Circuit Judges, and GEORGE, Senior District Judge.*

* Honorable Lloyd D. George, Senior United States District Judge for the District of Nevada, sitting by designation.

1. Under the 1909 Act, a properly registered artistic work receives copyright protection for 28 years from the date of first publication, renewable once for another 28 years. *See* Copyright Act of 1909, ch. 320, § 23, 35 Stat. 1075, 1080. The Copyright Act of 1976 amended the 1909 Act (effective January 1, 1978) in ways that are not material to this case. Prior to the 1997 amendment, § 303 provided:

> Copyright in a work created before January 1, 1978, but not theretofore in the public domain or copyrighted, subsists from January 1, 1978, and endures for the term provided by section 302. In no case, however, shall the term of copyright in such work expire before December 31, 2002; and, if

RYMER, Circuit Judge:

The ultimate question in this case is whether a phonorecord distributed in the late 1930s "published" the underlying work such that the clock started ticking under the Copyright Act of 1909.[1] In *La Cienega Music Co. v. ZZ Top*, 53 F.3d 950 (9th Cir.1995), we held that it did. However, in 1997 Congress amended the Copyright Act to provide that distribution of a phonorecord before January 1, 1978 shall *not* constitute a publication of the musical work. *See* 17 U.S.C. § 303(b). This action (for declaratory relief that a record released in 1938–39 is in the public domain) was filed after *La Cienega* but before the amendment. Thus, the appeal turns on which controls: *La Cienega* or the 1997 amendment to the Copyright Act.

ABKCO Music, Inc., whose library includes two Rolling Stones hits—*Love in Vain*, released in 1969, and *Stop Breakin' Down*, released in 1972—sought a ruling that the versions of these two songs recorded by Robert Johnson and distributed on a phonograph in the late 1930s were in the public domain under *La Cienega*. The district court determined on summary judgment that the Johnson versions of *Love in Vain* and *Stop Breakin' Down* irrevocably entered the public domain when the copyrights were not renewed

> the work is published on or before December 31, 2002, the term of copyright shall not expire before December 31, 2027.

Amended § 303 now provides:

> (a) Copyright in a work created before January 1, 1978, but not theretofore in the public domain or copyrighted, subsists from January 1, 1978, and endures for the term provided by section 302. In no case, however, shall the term of copyright in such a work expire before December 31, 2002; and, if the work is published on or before December 31, 2002, the term of copyright shall not expire before December 31, 2047.

> (b) The distribution before January 1, 1978, of a phonorecord shall not for any purpose constitute a publication of the musical work embodied therein.

Pub.L. 105–80, § 11, Nov. 13, 1997, 111 Stat. 1534; Pub.L. 105–298, Title I, § 102(c), Oct. 27, 1998, 112 Stat. 2827.

within the last year of the initial 28–year term of copyright protection. Stephen LaVere, Mimosa Records Production, Inc., d/b/a King of Spades Music, and Delta Haze, Inc., who claim legal title to the Johnson copyrights, appeal. We now join the Sixth Circuit in concluding that the 1997 amendment applies to pending cases.[2] Accordingly, § 303(b), rather than *La Cienega*, controls. We therefore reverse.

## I

Robert Johnson, a blues artist, recorded 29 songs before he was murdered in 1938. Sixteen were recorded in a November 1936 session, and, after the 1936 recordings were successfully distributed by Vocalion Records, Johnson returned to the studio in June 1937 to record 13 more songs including *Love in Vain* and *Stop Breakin' Down*. Vocalion released *Stop Breakin' Down* on March 20, 1938 and *Love in Vain* on February 9, 1939. No copyright registration for either song was filed. In the early 1960s, Columbia Records re-released Johnson's recordings.

In 1969, The Rolling Stones released an album called *Let It Bleed*, which contained an adapted version of *Love in Vain*, and in 1972, the Rolling Stones adapted *Stop Breakin' Down* for their album *Exile on Main Street*. ABKCO's predecessor filed a copyright registration on *Love in Vain* in May 1970 and ABKCO filed a copyright registration claiming protection for The Rolling Stones' adaptation and arrangement of *Stop Breakin' Down* in 1972.

Meanwhile, LaVere became interested in Johnson's music and by 1974 had located Carrie Thompson, Johnson's sister, who was thought to be his only surviving heir. LaVere agreed to try to generate income from Johnson's legacy and to pay Thompson (on behalf of Johnson heirs) fifty percent of all royalties collected in exchange for her assignment to him of her copyright interests in Johnson's works. LaVere formed King of Spades Music, a publishing company to administer the Johnson compositions and copyrights. Over time he assigned his copyright interests to Mimosa, which in turn assigned them to Delta Haze (whose dba is King of Spades Music).

In 1990, Columbia Records released a two-CD boxed set of Johnson's recordings entitled *Robert Johnson—The Complete Recordings*. *Love in Vain* and *Stop Breakin' Down* were included. It was quite successful. Columbia evidently recognized Johnson's common law copyrights as, eventually, did other successful pop artists who adapted Johnson's works. However, ABKCO did not. LaVere filed a copyright registration for the Columbia release in 1991. In February 1993 Delta Haze demanded that ABKCO cease and desist from unlicensed uses of the Johnson songs. Protracted negotiations followed. When it became clear they were going nowhere and Delta Haze threatened to sue in the summer of 1995, ABCKO filed this action for declaratory relief on November 9, 1995. It sought an order that the Johnson versions of *Love in Vain* and *Stop Breakin' Down* are in the public domain under *La Cienega*. Delta Haze counterclaimed for a declaration that no protectable copyright interest exists in The Rolling Stones' versions of *Love in Vain* and *Stop Breakin' Down* and that it, rather than AB-KCO, is the sole owner of the legal copyright in these compositions.

Delta Haze moved to dismiss pursuant to Rule 12(b)(7) on the grounds that the Johnson Estate was an indispensable party and that ABKCO lacked standing. Both motions were denied. Each party moved for summary judgment, but before the district court could rule, § 303(b) was signed into law. The district court granted AB-KCO's motion, and denied Delta Haze's cross-motion, holding that the Robert Johnson versions of *Love in Vain* and *Stop Breakin' Down* irrevocably entered the public domain when the copyrights were not renewed within the last year of the

---

**2.** See *Mayhew v. Allsup*, 166 F.3d 821 (6th Cir.1999).

initial 28–year term of copyright protection.

Delta Haze timely appealed.

## II

We first address two arguments advanced by Delta Haze that would require dismissal, if correct.

### A

■ Delta Haze contends that ABKCO lacks standing because it did not allege ownership and registration with respect to *Stop Breakin' Down* as well as *Love in Vain,* and averred that it filed this action on account of a threatened suit for infringement arising only from *Love in Vain.* We disagree that the complaint's failure specifically to mention *Stop Breakin' Down* matters, for the record shows that ABKCO in fact filed a copyright registration (No. Eu 326810) on *Stop Breaking Down* April 27, 1972 as an "adaptation of words & music of a work in P.D." The registration reflects Mick Jagger and Keith Richard as authors. Further, the record shows that from Delta Haze's February 22, 1993 letter on, both parties understood the dispute to involve all Johnson works recorded by the Rolling Stones, including *Stop Breakin' Down* as well as *Love in Vain.* Suit was clearly threatened in June and August of 1995. Therefore, when ABKCO filed its action for declaratory relief on November 9, 1995, there was an actual controversy with respect to rights in the Johnson works sufficient to confer standing. *See, e.g., Coral Constr. Co. v. King Co.,* 941 F.2d 910, 929 (9th Cir.1991) (a plaintiff seeking declaratory relief must show a very significant possibility of future harm for standing); *Hal Roach Studios, Inc. v. Richard Feiner & Co.,* 896 F.2d 1542, 1555–56 (9th Cir.1989) (for standing a plaintiff must have a real and reasonable apprehension that he will be subject to liability if he continues to manufacture his product).

### B

■ Delta Haze also argues that ABKCO's action should have been dismissed for failure to join the Johnson Estate, the beneficial owner of the copyrights, as an indispensable party under Rule 19 of the Federal Rules of Civil Procedure. Although the transactions are not entirely clear, it appears from LaVere's declaration that the Johnson Estate acknowledged his agreement with Johnson's sister, and that he and the Administrator of the Johnson Estate entered into a contract whereby the Estate authorized LaVere to act as the Estate's agent for purposes of exploiting the Johnson copyrights (as he had with Thompson) in exchange for LaVere's remitting fifty percent of the royalties received from the boxed set of Johnson compositions. He has been doing so for years. Nothing in the record suggests that the Estate's interests diverge from LaVere's, or Delta Haze's, with respect to anything at issue in this lawsuit, or that LaVere does not adequately represent whatever interests the Estate has; they are the same as his in establishing that the Johnson copyrights did not fall into the public domain before the Columbia release in 1990. Under these circumstances, we do not see how the district court could have abused its discretion in declining to find the Estate indispensable.

## III

■ Turning to the central issue on appeal, Delta Haze argues that applying § 303(b) to this case presents no retroactivity problem because Congress was clarifying, not changing, the law when it affirmed through § 303(b) that "[t]he distribution of a phonorecord before January 1, 1978 shall not for any purpose constitute a publication of the musical work embodied therein." ABKCO sees the amendment to § 303 as a departure which changed prior law and whose application to a pending case would have an impermissible retroactive effect under *Landgraf v. USI Film Products,* 511 U.S.

244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994). Delta Haze disagrees that, even if retroactivity analysis is required, the amendment is retroactive because Congress expressly prescribed its reach "for any purpose" to all releases of phonorecords before January 1, 1978.

## A

This issue has a long history, stretching back to 1831, when Congress first extended copyright protection to original musical compositions. At that time, there was no technology for mechanically reproducing music, and Congress merely protected the copying of the sheet music. *See Goldstein v. California,* 412 U.S. 546, 564, 93 S.Ct. 2303, 37 L.Ed.2d 163 (1973). But in the latter half of the nineteenth century, piano rolls were invented. They were an early form of mechanical reproduction of specific musical performances, which the Supreme Court held in 1908 did not constitute a "copy" of the copyrighted musical composition because they were not written or printed in tangible form. *White–Smith Music Publishing Co. v. Apollo Co.,* 209 U.S. 1, 17, 28 S.Ct. 319, 52 L.Ed. 655 (1908). Put another way, piano rolls were a *performance,* rather than a *publication,* of a musical composition. A year after *White–Smith,* Congress passed the 1909 Copyright Act, giving composers of musical compositions control over recordings of their creations. *See Goldstein,* 412 U.S. at 565–66, 93 S.Ct. 2303. However, the intent of Congress in the 1909 Act was not to accord recordings the same copyright status as a written score, but

> only to establish the limits of *the composer's* right; composers were to have control over the recordings themselves. Nowhere does the report indicate that Congress considered records as anything but a component part of a machine, capable of reproducing an original composition, or that Congress intended records, as *renderings of original artistic performance,* to be free from state control.

*Id.* at 566, 93 S.Ct. 2303 (emphasis in original). The 1909 Copyright Act governed rights in musical compositions until January 1, 1978 (the effective date of the 1976 Copyright Act). *See La Cienega,* 53 F.3d at 952 n. 1.

■ "Under the 1909 Act, an unpublished work was protected by state common law copyright from the moment of its creation until it was either published or until it received protection under the federal copyright scheme." *Id.* at 952. When a work was published, it lost common law protection. *See id.* at 953. The owner could obtain federal protection for the published work by complying with the 1909 Act's requirements; otherwise, the work entered the public domain. *See Twin Books Corp. v. Walt Disney Co.,* 83 F.3d 1162, 1165 (9th Cir.1996). Under § 9 of the 1909 Act, "[a]ny person ... may secure copyright for his work by publication thereof with the notice of copyright required by this title." *Id.*

The 1909 Act did not define the term "publication"; however, the Second Circuit held in *Rosette v. Rainbo Record Mfg. Corp.,* 546 F.2d 461 (2d Cir.1976), that the sale of phonorecords in the 1950s did not constitute publication. As explained more fully by the district court, *Rosette v. Rainbo Record Manufacturing Corp.,* 354 F.Supp. 1183 (S.D.N.Y.1973), the drafters of the 1909 Act did not intend to extend copyright protection to mechanical reproductions of musical compositions; rather, they intended "only to give the composer or copyright proprietor the control, in accordance with the provisions of the bill, of the manufacture and use of such [mechanical reproductions]." *Id.* at 1190 (quoting House Reports, 60th Cong.2d Sess., Vol. 1, at 9 (1909)). Therefore, the 1909 Act did not overrule *White–Smith, see id.* at 1191, and "a performance of an unpublished musical manuscript [on a phonograph record] is not a publication." *Id.* at 1190. As the court noted, this "accords with the expressed view of the Copyright Bar and the music industry." *Id.*

Apart from a handful of district court opinions holding that release of a phonorecord published the underlying work,[3] *Rosette* remained the leading case until we rendered our decision in *La Cienega* in 1995. There, La Cienega Music Company accused the band ZZ Top and others of copying a song it owned called "Boogie Chillen." La Cienega had released recordings of different versions of this song in 1948, 1950, and 1970; ZZ Top released an album in 1973 with a song it called "La Grange" that was similar to *Boogie Chillen* and became ZZ Top's signature song. Its position was that La Cienega's release of *Boogie Chillen* on phonorecords was a publication; La Cienega argued that publication of the songs did not occur until it filed a notice of copyright with the Copyright Office in 1967, 1970, and 1992 respectively. *See La Cienega*, 53 F.3d at 953. We declined to follow *Rosette*, holding instead that selling a recording constitutes "publication" under the Copyright Act of 1909.

However, in November 1997, the Copyright Act was amended to provide that "[t]he distribution before January 1, 1978, of a phonorecord shall not for any purpose constitute a publication of the musical work embodied therein." 17 U.S.C. § 303(b); *see* Pub.L. No. 105–80, 111 Stat. 1529 (November 13, 1997). As we have previously observed, "the result of our holding in *La Cienega* has been subsequently changed by Congress' passage and enactment of [the amendment]." *Batjac Productions Inc. v. GoodTimes Home Video Corp.*, 160 F.3d 1223, 1235 (9th Cir. 1998).

There is no dispute that if *La Cienega* applies to this case, the Johnson songs were published in 1938 and 1939 when they were released on phonorecord. The 28–year period of copyright protection under the 1909 Act would have begun to run at that time, expiring in 1966 and 1967. Since the copyrights were not renewed for a second 28–year term, the songs would have passed into the public domain. If, on the other hand, § 303(b) applies, the Johnson songs would not have been published until the 1990 Columbia release was copyrighted. The 28–year period for copyright protection would not have been triggered until then; Johnson's copyrights would not have run out in 1967–68; and neither *Love in Vain* nor *Stop Breakin' Down* would be in the public domain.

Thus, the question that matters is whether § 303(b) is retroactive.

### B

LaVere contends that we need not be concerned with retroactivity at all, because the purpose and effect of § 303(b) was to clarify, rather than to change, existing law. We have long recognized that clarifying legislation is not subject to any presumption against retroactivity and is applied to all cases pending as of the date of its enactment:

> If [the statute] were to be characterized in the latter fashion [as a "substantial change in the law"], its retroactive application would pose a series of potential constitutional problems. If however [the statute] merely clarifies what [the prior statute] was originally intended to mean ... it has no retroactive effect that might be called into constitutional question.

*Beverly Community Hosp. Ass'n. v. Belshe*, 132 F.3d 1259, 1265 (9th Cir.1997). "Normally, when an amendment is deemed clarifying rather than substantive, it is applied retroactively." *United States v. Donaghe*, 50 F.3d 608, 612 (9th Cir.1994). "Given the extraordinary difficulty that the courts have found in divining the intent of

---

3. *See McIntyre v. Double–A Music Corp.*, 166 F.Supp. 681 (S.D.Cal.1958) (release on phonorecord constituted publication under the 1909 Copyright Act); *Shapiro, Bernstein & Co. v. Miracle Record Co.*, 91 F.Supp. 473 (N.D.Ill.1950) (release of phonorecord published the musical work); *Mills Music, Inc. v. Cromwell Music, Inc.*, 126 F.Supp. 54 (S.D.N.Y.1954) (manufacture and sale of phonorecords was a publication).

the original Congress, a decision by the current Congress to intervene by expressly clarifying the meaning of [the statute] is worthy of real deference.... We therefore honor Congress' 'clarification' label and accept [the new] provisions as a statement of what [the statute] has meant all along." *Beverly Community Hosp.*, 132 F.3d at 1266.

There is a good argument that the 1997 amendment simply clarifies what the meaning of the 1909 Act was all along—namely, that the distribution of phonorecords did not constitute publication of the underlying works. As the House Report on the 1997 amendment indicates, the bill that resulted in § 303(b) "affirms that the distribution of a phonorecord to the public before January 1, 1978 did not constitute publication of a musical composition embodied in that phonorecord under the 1909 Copyright Act. It is intended to restore the law to what it was before the decision of the Ninth Circuit Court of Appeals in *La Cienega Music Co. v. Z.Z. Top.*" H.R.Rep. No. 105–325, at 5 (1997). Thus, the Report states, § 303(b) "reverses the *La Cienega* decision and affirms in the Copyright Act that a phonorecord released before 1978 did not constitute a 'publication' under the 1909 Copyright Act." *Id.* The Report also notes that the amendment comports with the long-standing interpretation of the Copyright Office that release of a phonorecord was not a "copy" for purposes of the Act, and the Congressional Budget Office opined that the bill would have no fiscal impact because it "would confirm the Copyright Office's treatment of pre–1978 musical compositions." *Id.* at 4. In sum, the Report concludes:

The *La Cienega* decision has, therefore, placed a cloud over the legal status of a large number of musical works recorded and sold before January 1, 1978. Moreover, it has called into question the long established interpretation of the Copyright Office. It is the intent of this section to remove the cloud and bring the law into conformity with the Second

Circuit opinion and Copyright office practices.

*Id.* at 5.

Members of Congress expressed the same view. For example, Senator Leahy, a Senate co-sponsor, said the bill "was intended to clarify the Copyright Law of 1909 on an issue that has become a matter of increasing litigation in a number of Federal Circuits since the Ninth Circuit decision in the ZZ Top case." 143 Cong. Rec. S11498 (1997). Senator Hatch, also a sponsor and Chair of the Senate Judiciary Committee, remarked that "*Rosette* comports with the nearly universal understanding of the music and sound recording industries and of the Copyright Office"; "overturning the *La Cienega* decision will restore national uniformity on this important issue by confirming the wisdom of the custom and usage of the affected industries and of the Copyright Office for nearly 100 years." 143 Cong. Rec. S11301 (1997). Similarly on the House side, Representative Coble, who sponsored the legislation and chaired the House Judiciary Committee Subcommittee on Courts and Intellectual Property, introduced the bill on the floor by explaining that it "clarifies that the distribution of a phonorecord before January 1, 1978, did not constitute a publication of the musical work embodied therein." 143 Cong. Rec. H9882 (1997). Representative Bono stated that the bill was needed because *La Cienega* "has jeopardized the private property rights for thousands of creative individuals who live within the jurisdiction of the Federal Court of Appeals of the Ninth Circuit." 143 Cong. Rec. H9882 (1997). And Representative Berman noted that composers had "rel[ied] on an industry standard of many decades duration," a "long-time understanding of copyright law [which] has been ratified and reaffirmed by the Second Circuit." "The *La Cienega* decision took that settled law and cast it on its head, threatening to thrust into the public domain hundreds of thousands of musical works

which presently enjoy copyright protection." 143 Cong. Rec. H9882 (1997).

■ . From this record it is evident that Congress believed *La Cienega* was aberrational, that *Rosette* was the accepted and controlling interpretation, and that § 303(b) was enacted to make this clear. ABKCO points out that even if this is so, and even assuming that § 303(b) "clarified" that the Second Circuit's construction in *Rosette* was correct, the effect was to *change* the law in the *Ninth* Circuit. Of course this is literally true, but the policy of the Copyright Office had always been that distribution of a phonorecord before 1978 does not publish the underlying musical composition, and *Rosette* was the only precedential interpretation until ours in 1995. Once we created a circuit split, Congress acted to make clear that "publication" in the 1909 Copyright Act, which it did not define in the Act itself, meant what *Rosette* and the Copyright Office said it meant with respect to mechanical reproductions such as phonorecords. An amendment in the face of an ambiguous statute or a dispute among the courts as to its meaning indicates that Congress is clarifying, rather than changing, the law. *See, e.g., Bedoni v. Navajo–Hopi Indian Relocation Comm'n.*, 878 F.2d 1119,1121 (9th Cir.1989) ("Where, as here, an act is ambiguous, an amendment thereto is an indication that it is intended to clarify, rather than change, the existing law.") (citation, internal quotations, and alterations omitted); *Callejas v. McMahon*, 750 F.2d 729, 731 (9th Cir.1984) ("The mere fact of an amendment itself does not indicate the legislature intended to change a law.... [A] dispute or ambiguity, such as a split in the circuits, is an indication that a subsequent amendment is intended to clarify, rather than change, the existing law.") (citations, internal quotations, and alterations omitted). It follows that the 1997 amendment to § 303 was a "statement of what [the 1909 Copyright Act] has meant all along." *Beverly Community Hosp.*, 132 F.3d at 1266. As such, no retroactivity problem is presented by applying it to this case.

However, ABKCO insists that § 303(b) cannot be applied to its pending case without running afoul of *Landgraf* because Congress did not clearly and unequivocally require retroactive application. It suggests that nothing can be inferred from the fact that the only recordings to which the amendment could possibly apply were those released before 1978, because publication no longer determined copyright status for recordings released after 1978; nor does declaring that the amendment "take effect on enactment" imply that it should apply to pending cases. We do not agree. Section 303(b) would make no sense if it were to be applied solely prospectively, because it explicitly applies to conduct occurring before January 1, 1978. Congress unequivocally declared that phonorecord distribution prior to January 1, 1978 did not constitute publication of the musical compositions and made no exception for musical compositions at issue in cases pending at the time of the statute's enactment. The Sixth Circuit considered the same problem in *Mayhew v. Allsup*, 166 F.3d 821 (6th Cir.1999), and its reasoning is persuasive:

> It is clear from the language employed that § 303(b) should be applied to pending cases. First, the subsection obviously applies to pre-enactment conduct. In fact, it applies only to the distribution of records prior to January 1, 1978. Thus, applying the statute to pending cases has no impact on the conduct that is the subject of the subsection. Second, the subsection provides that the distribution of phonorecords "shall not for any purpose constitute a publication." This court would be defying the express mandate of the statute if it were to decide on de novo review that phonorecord distribution constitutes publication. Finally, the presumption against retroactive application of statutes is based, in part, on a hesitancy to reverse settled expectations. In enacting § 303(b), however,

Congress has resolved a problem of unsettled expectations that had arisen from the circuit split. We conclude that § 303(b) should be applied in resolving the present appeal.

*Id.* at 824 (citations omitted). We agree, and hold that § 303(b) controls. Because § 303(b) controls, the Johnson versions of *Love in Vain* and *Stop Breakin' Down* were not in the public domain solely on account of their being released on phonorecords in the 1930s.[4]

## IV

Delta Haze also asks for reversal of the district court's denial of its cross-motion for summary judgment and, failing that, argues that judgment should have been granted on its counterclaims. To the extent that its cross-motion is the mirror image of ABKCO's, Delta Haze is entitled to a judgment declaring that the Johnson versions of *Love in Vain* and *Stop Breakin' Down* did not enter the public domain when the phonorecords on which they were recorded were released in 1938 and 1939. Beyond this, however, we believe the district court is in a better position than we to sort out the issues that remain. For example, Delta Haze argues that AB-KCO can have no ownership interest in The Rolling Stones' versions of the two works because The Rolling Stones added no original material. This may, or may not, raise triable issues—a point that we assume the district court has never considered, given its ruling that the Johnson works were in the public domain when The Rolling Stones made its adaptations.

ABKCO argues that dismissal of Delta Haze's counterclaim was proper because it never threatened to sue for infringement, therefore there was no controversy between them to give the district court subject matter jurisdiction. But we cannot be certain of this, for the counterclaims appear to contest ABKCO's claim to any protectable interest in the adaptation performed by the Rolling Stones. In addition, ABKCO contends that whatever claim Delta Haze might be able to state is time-barred. Again, these issues are best left to the district court on remand.

Because we cannot tell from the district court's order why it dismissed the counterclaims (it could simply have been that the counterclaims necessarily fell given the decision that the Johnson versions were in the public domain), we vacate the order dismissing the counterclaims. In doing so, we intimate no view one way or the other on the merits of the counterclaims or any motions that may be made with respect to them.

To summarize: we reverse the order and judgment granting ABKCO's motion for summary judgment; we order judgment to be entered for Delta Haze that the Robert Johnson versions of *Love in Vain* and *Stop Breakin' Down* did not enter the public domain when phonorecords embodying those works were released before 1978; and we vacate the judgment for ABKCO on Delta Haze's counterclaims.

REVERSED and REMANDED.

---

**4.** Given our conclusion that § 303(b) applies, we do not reach Delta Haze's argument that even under *La Cienega,* the district court's grant of summary judgment to ABKCO was improper because there were triable issues of fact regarding whether the songs were released with Johnson's consent or authorization.