## GOLDSTEIN ET AL. *v.* CALIFORNIA

No. 71–1192.   Argued December 13, 1972—Decided June 18, 1973

BURGER, C. J., delivered the opinion of the Court, in which STEW-
ART, WHITE, POWELL, and REHNQUIST, JJ., joined. DOUGLAS, J.,
*post*, p. 572, and MARSHALL, J., *post*, p. 576, filed dissenting opinions,
in which BRENNAN and BLACKMUN, JJ., joined.

*Arthur Leeds* argued the cause and filed briefs for
petitioners.

*David M. Schacter* argued the cause for respondent.
With him on the briefs was *Roger Arnebergh.**

*\*Francis M. Pinckney* filed a brief for Custom Recording Co.,
Inc., et al. as *amici curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed by *Evelle J.
Younger*, Attorney General, *Edward A. Hinz, Jr.*, Chief Assistant
Attorney General, *William E. James* and *Doris H. Maier*, Assistant
Attorneys General, and *Charles P. Just*, Deputy Attorney General,
for the State of California; by *Robert L. Shevin*, Attorney General,
*pro se*, and *William J. Dunaj*, Special Assistant Attorney General,
for the Attorney General of Florida; by *Louis J. Lefkowitz*, Attorney
General, *pro se*, *Samuel A. Hirshowitz*, First Assistant Attorney
General, and *Daniel M. Cohen*, Assistant Attorney General, for
the Attorney General of New York; by *J. Shane Creamer*, Attorney
General, for the Commonwealth of Pennsylvania; by *David M.
Pack*, Attorney General of Tennessee; by *Crawford C. Martin*,
Attorney General, *pro se*, and *Charles F. Herring* for the Attorney
General of Texas; by *Sidney A. Diamond* and *Ernest S. Meyers* for
Recording Industry Association of America, Inc.; by *Paul G.
Zurkowski* for Information Industry Association; by *Henry Kaiser,
Eugene Gressman, Ronald Rosenberg*, and *Mortimer Becker* for
American Federation of Musicians et al.; and by *Julian T. Abeles*
and *Robert C. Osterberg* for Harry Fox Agency, Inc.

Mr. Chief Justice Burger delivered the opinion of the Court.

We granted certiorari to review petitioners' conviction under a California statute making it a criminal offense to "pirate" recordings produced by others.

In 1971, an information was filed by the State of California, charging petitioners in 140 counts with violating § 653h of the California Penal Code. The information charged that, between April 1970 and March 1971, petitioners had copied several musical performances from commercially sold recordings without the permission of the owner of the master record or tape.[1] Petitioners moved to dismiss the complaint on the grounds that § 653h was in conflict with Art. I, § 8, cl. 8, of the Con-

---

[1] In pertinent part, the California statute provides:

"(a) Every person is guilty of a misdemeanor who:

"(1) Knowingly and willfully transfers or causes to be transferred any sounds recorded on a phonograph record, . . . tape, . . . or other article on which sounds are recorded, with intent to sell or cause to be sold, . . . such article on which such sounds are so transferred, without the consent of the owner.

"(2) . . .

.      .      .      .      .

"(b) As used in this section, 'person' means any individual, partnership, corporation or association; and 'owner' means the person who owns the master phonograph record, . . . master tape, . . . or other device used for reproducing recorded sounds on phonograph records, . . . tapes, . . . or other articles on which sound is recorded, and from which the transferred recorded sounds are directly or indirectly derived."

Specifically, each count of the information alleged that, in regard to a particular recording, petitioners had, "at and in the City of Los Angeles, in the County of Los Angeles, State of California . . . wilfully, unlawfully and knowingly transferred and caused to be transferred sounds recorded on a tape with the intent to sell and cause to be sold, such tape on which such sounds [were] so transferred . . . ."

stitution,[2] the "Copyright Clause," and the federal statutes enacted thereunder. Upon denial of their motion, petitioners entered pleas of *nolo contendere* to 10 of the 140 counts; the remaining counts were dismissed. On appeal, the Appellate Department of the California Superior Court sustained the validity of the statute. After exhausting other state appellate remedies, petitioners sought review in this Court.

I

Petitioners were engaged in what has commonly been called "record piracy" or "tape piracy"—the unauthorized duplication of recordings of performances by major musical artists.[3] Petitioners would purchase from a retail distributor a single tape or phonograph recording of the popular performances they wished to duplicate. The original recordings were produced and marketed by recording companies with which petitioners had no contractual relationship. At petitioners' plant, the recording was reproduced on blank tapes, which could in turn be used to replay the music on a tape player. The tape was then wound on a cartridge. A label was attached, stating the title of the recorded performance—the same title as had appeared on the original recording, and the name of the performing artists.[4] After final packaging,

[2] Article I, § 8, cl. 8, provides that Congress shall have the power "To promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries . . . ."

[3] Since petitioners did not proceed to trial, the factual record before the Court is sparse. However, both parties indicate that a complete description of petitioners' method of operation may be found in the record of *Tape Industries Assn. of America* v. *Younger*, 316 F. Supp. 340 (CD Cal. 1970), appeal dismissed for lack of jurisdiction, 401 U. S. 902 (1971), appeal pending United States Court of Appeals, CA9, No. 26,628.

[4] An additional label was attached to each cartridge by petitioners, stating that no relationship existed between petitioners and the pro-

the tapes were distributed to retail outlets for sale to the public, in competition with those petitioners had copied.

Petitioners made no payments to the artists whose performances they reproduced and sold, or to the various trust funds established for their benefit; no payments were made to the producer, technicians, or other staff personnel responsible for producing the original recording and paying the large expenses incurred in production.[5] No payments were made for the use of the artists' names or the album title.

The challenged California statute forbids petitioners to transfer any performance fixed on a tape or record onto other records or tapes with the intention of selling the duplicates, unless they have first received permission from those who, under state law, are the owners of the master recording. Although the protection afforded to each master recording is substantial, lasting for an unlimited time, the scope of the proscribed activities is narrow. No limitation is placed on the use of the music, lyrics, or arrangement employed in making the master recording. Petitioners are not precluded from hiring their own musicians and artists and recording an exact imitation of the performance embodied on the master recording. Petitioners are even free to hire the same artists who made the initial recording in order to

---

ducer of the original recording or the individuals whose performances had been recorded. Consequently, no claim is made that petitioners misrepresented the source of the original recordings or the manufacturer of the tapes.

[5] The costs of producing a single original longplaying record of a musical performance may exceed $50,000 or $100,000. *Tape Industries Assn. of America* v. *Younger, supra,* at 344; Hearings on S. 646 and H. R. 6927 before Subcommittee No. 3 of the House Committee on the Judiciary, 92d Cong., 1st Sess., 27–28 (1971). For the performance recorded on this record, petitioners would pay only the retail cost of a single longplaying record or a single tape.

duplicate the performance. In essence, the statute thus provides copyright protection solely for the specific expressions which compose the master record or tape.

Petitioners' attack on the constitutionality of § 653h has many facets. First, they contend that the statute establishes a state copyright of unlimited duration, and thus conflicts with Art. I, § 8, cl. 8, of the Constitution. Second, petitioners claim that the state statute interferes with the implementation of federal policies inherent in the federal copyright statutes. 17 U. S. C. § 1 et seq. According to petitioners, it was the intention of Congress, as interpreted by this Court in Sears, Roebuck & Co. v. Stiffel Co., 376 U. S. 225 (1964), and Compco Corp. v. Day-Brite Lighting, 376 U. S. 234 (1964), to establish a uniform law throughout the United States to protect original writings. As part of the federal scheme, it is urged that Congress intended to allow individuals to copy any work which was not protected by a federal copyright. Since § 653h effectively prohibits the copying of works which are not entitled to federal protection, petitioners contend that it conflicts directly with congressional policy and must fall under the Supremacy Clause of the Constitution. Finally, petitioners argue that 17 U. S. C. § 2, which allows States to protect unpublished writings,[6] does not authorize the challenged state provision; since the records which petitioners copied had previously been released to the public, petitioners contend that they had, under federal law, been published.

We note at the outset that the federal copyright statutes to which petitioners refer were amended by Con-

---

[6] Title 17 U. S. C. § 2 provides: "Nothing in this title shall be construed to annul or limit the right of the author or proprietor of an unpublished work, at common law or in equity, to prevent the copying, publication, or use of such unpublished work without his consent, and to obtain damages therefor."

gress while their case was pending in the state courts. In 1971, Pub. L. 92–140, 85 Stat. 391, 17 U. S. C. §§ 1 (f), 5 (n), 19, 20, 26, 101 (e), was passed to allow federal copyright protection of recordings. However, § 3 of the amendment specifically provides that such protection is to be available only to sound recordings "fixed, published, and copyrighted" on and after February 15, 1972, and before January 1, 1975, and that nothing in Title 17, as amended is to "be applied retroactively or [to] be construed as affecting in any way any rights with respect to sound recordings fixed before" February 15, 1972. The recordings which petitioners copied were all "fixed" prior to February 15, 1972. Since, according to the language of § 3 of the amendment, Congress did not intend to alter the legal relationships which govern these recordings, the amendments have no application in petitioners' case.[7]

## II

Petitioners' first argument rests on the premise that the state statute under which they were convicted lies beyond the powers which the States reserved in our federal system. If this is correct, petitioners must prevail, since the States cannot exercise a sovereign power which, under the Constitution, they have relinquished to the Federal Government for its exclusive exercise.

## A

The principles which the Court has followed in construing state power were stated by Alexander Hamilton in Number 32 of The Federalist:

"An entire consolidation of the States into one complete national sovereignty would imply an entire subordination of the parts; and whatever powers might remain in them, would be altogether depend-

[7] No question is raised in the present case as to the power of the States to protect recordings fixed after February 15, 1972.

ent on the general will. But as the plan of the [Constitutional] convention aims only at a partial union or consolidation, the State governments would clearly retain all the rights of sovereignty which they before had, and which were not, by that act, *exclusively* delegated to the United States. This exclusive delegation, or rather this alienation, of State sovereignty, would only exist in three cases: where the Constitution in express terms granted an exclusive authority to the Union; where it granted in one instance an authority to the Union, and in another prohibited the States from exercising the like authority; and where it granted an authority to the Union, to which a similar authority in the States would be absolutely and totally *contradictory* and *repugnant*." [8]

The first two instances mentioned present no barrier to a State's enactment of copyright statutes. The clause of the Constitution granting to Congress the power to issue copyrights does not provide that such power shall vest exclusively in the Federal Government. Nor does the Constitution expressly provide that such power shall not be exercised by the States.

In applying the third phase of the test, we must examine the manner in which the power to grant copyrights may operate in our federal system. The objectives of our inquiry were recognized in *Cooley* v. *Board of Wardens*, 12 How. 299 (1852), when, in determining whether the power granted to Congress to regulate commerce [9] was "compatible with the existence of a similar power in the States," the Court noted:

"Whatever subjects of this power are in their nature

---

[8] The Federalist No. 32, p. 241 (B. Wright ed. 1961); see *Cooley* v. *Board of Wardens*, 12 How. 299, 318–319 (1851).

[9] Art. I, § 8, cl. 3.

national, or admit only of one uniform system, or plan of regulation, may justly be said to be of such a nature as to require exclusive legislation by Congress." *Id.*, at 319.

The Court's determination that Congress alone may legislate over matters which are *necessarily* national in import reflects the basic principle of federalism. Mr. Chief Justice Marshall said,

> "The genius and character of the [federal] government seem to be, that its action is to be applied to all the external concerns of the nation, and to those internal concerns which affect the States generally; but not to those which are completely within a particular State, which do not affect other States, and with which it is not necessary to interfere, for the purpose of executing some of the general powers of the government." *Gibbons* v. *Ogden*, 9 Wheat. 1, 195 (1824).

The question whether exclusive federal power must be inferred is not a simple one, for the powers recognized in the Constitution are broad and the nature of their application varied. The warning sounded by the Court in *Cooley* may equally be applicable to the Copyright Clause:

> "Either absolutely to affirm, or deny that the nature of [the federal power over commerce] requires exclusive legislation by Congress, is to lose sight of the nature of the subjects of this power, and to assert concerning all of them, what is really applicable but to a part." 12 How., at 319.

We must also be careful to distinguish those situations in which the concurrent exercise of a power by the Federal Government and the States or by the States alone *may possibly* lead to conflicts and those situations where conflicts *will necessarily* arise. "It is not . . . a

mere possibility of inconvenience in the exercise of powers, but an immediate constitutional repugnancy that can by implication alienate and extinguish a pre-existing right of [state] sovereignty." The Federalist No. 32, p. 243 (B. Wright ed. 1961).

Article I, § 8, cl. 8, of the Constitution gives to Congress the power—

> "To promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries . . . ."

The clause thus describes both the objective which Congress may seek and the means to achieve it. The objective is to promote the progress of science and the arts. As employed, the terms "to promote" are synonymous with the words "to stimulate," "to encourage," or "to induce." [10] To accomplish its purpose, Congress may grant to authors the exclusive right to the fruits of their respective works. An author who possesses an unlimited copyright may preclude others from copying his creation for commercial purposes without permission. In other words, to encourage people to devote themselves to intellectual and artistic creation, Congress may guarantee to authors and inventors a reward in the form of control over the sale or commercial use of copies of their works.

The objective of the Copyright Clause was clearly to facilitate the granting of rights national in scope. While the debates on the clause at the Constitutional Convention were extremely limited, its purpose was described by James Madison in the Federalist:

> "The utility of this power will scarcely be questioned. The copyright of authors has been solemnly

---

[10] See *Kendall* v. *Winsor*, 21 How. 322, 328 (1859); *Mitchell* v. *Tilghman*, 19 Wall. 287, 418 (1874); *Bauer* v. *O'Donnell*, 229 U. S. 1, 10 (1913).

adjudged, in Great Britain, to be a right of common law. The right to useful inventions seems with equal reason to belong to the inventors. The public good fully coincides in both cases with the claims of individuals. The States cannot separately make effectual provision for either of the cases, and most of them have anticipated the decision of this point, by laws passed at the instance of Congress." [11]

The difficulty noted by Madison relates to the burden placed on an author or inventor who wishes to achieve protection in all States when no federal system of protection is available. To do so, a separate application is required to each state government; the right which in turn may be granted has effect only within the granting State's borders.[12] The national system which Madison supported eliminates the need for multiple applications and the expense and difficulty involved. In effect, it allows Congress to provide a reward greater in scope than any particular State may grant to promote progress in those fields which Congress determines are worthy of national action.

Although the Copyright Clause thus recognizes the potential benefits of a national system, it does not indicate

---

[11] The Federalist No. 43, p. 309 (B. Wright ed. 1961).

[12] Numerous examples may be found in our early history of the difficulties which the creators of items of national import had in securing protection of their creations in all States. For example, Noah Webster, in his effort to obtain protection for his book, A Grammatical Institute of the English Language, brought his claim before the legislatures of at least six States, and perhaps as many as 12. See B. Bugbee, The Genesis of American Patent and Copyright Law 108–110, 120–124 (Wash., D. C., 1967); H. R. Rep. No. 2222, 60th Cong., 2d Sess., 2 (1909). Similar difficulties were experienced by John Fitch and other inventors who desired to protect their efforts to perfect a steamboat. See Federico, State Patents, 13 J. Pat. Off. Soc. 166, 170–176 (1931).

that all writings are of national interest or that state legislation is, in all cases, unnecessary or precluded. The patents granted by the States in the 18th century show, to the contrary, a willingness on the part of the States to promote those portions of science and the arts which were of local importance.[13] Whatever the diversity of people's backgrounds, origins, and interests, and whatever the variety of business and industry in the 13 Colonies, the range of diversity is obviously far greater today in a country of 210 million people in 50 States. In view of that enormous diversity, it is unlikely that all citizens in all parts of the country place the same importance on

---

[13] As early as 1751, Massachusetts granted to Benjamin Crabb the exclusive right to employ a specific process for the manufacture of candles out of whale oil. It is not clear whether Crabb invented the process. The Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay, Vol. 3, Session of Jan. 10, 1751, c. 19, pp. 546–547 (1878). In 1780, Pennsylvania granted a patent to Henry Guest for the processing of tanning oil and blubber, noting specifically that the patent was "a reward for his discovery and for the purpose of promoting useful manufactories in this state." The Statutes at Large of Pennsylvania from 1682 to 1801, Vol. 10, p. 132 (J. Mitchell & H. Flanders eds. 1904). Similarly, South Carolina granted protection to Peter Belin in 1786 for newly designed waterworks which aided in the production of rice, a staple of South Carolina agriculture, and other products. Another patent relating to the processing of rice was granted by South Carolina in 1788. The Statutes at Large of South Carolina, Vol. 4, p. 755 (T. Cooper ed. 1838); id., Vol. 5, p. 69 (1839). In 1787, Maryland granted a patent on a spinning and carding machine "to encourage useful inventions, as well as promote the manufacture of cotton and wool within this state . . . ." The Laws of Maryland, Vol. 2, Session of Nov. 6, 1786–Jan. 20, 1787, c. 23 (W. Kilty ed. 1800). In the same year, Pennsylvania patented certain devices relating to flour mills, noting that these devices would "tend to simplify and render cheap the manufacture of flour which is one of the principal staples of this commonwealth . . . ." The Statutes at Large of Pennsylvania from 1682 to 1801, Vol. 12, pp. 483–484 (J. Mitchell & H. Flanders eds. 1906).

works relating to all subjects. Since the subject matter to which the Copyright Clause is addressed may thus be of purely local importance and not worthy of national attention or protection, we cannot discern such an unyielding national interest as to require an inference that state power to grant copyrights has been relinquished to *exclusive* federal control.

The question to which we next turn is whether, in actual operation, the exercise of the power to grant copyrights by some States will prejudice the interests of other States. As we have noted, a copyright granted by a particular State has effect only within its boundaries. If one State grants such protection, the interests of States which do not are not prejudiced since their citizens remain free to copy within their borders those works which may be protected elsewhere. The interests of a State which grants copyright protection may, however, be adversely affected by other States that do not; individuals who wish to purchase a copy of a work protected in their own State will be able to buy unauthorized copies in other States where no protection exists. However, this conflict is neither so inevitable nor so severe as to compel the conclusion, that state power has been relinquished to the exclusive jurisdiction of the Congress. Obviously when some States do not grant copyright protection—and most do not—that circumstance reduces the economic value of a state copyright, but it will hardly render the copyright worthless. The situation is no different from that which may arise in regard to other state monopolies, such as a state lottery, or a food concession in a limited enclosure like a state park; in each case, citizens may escape the effect of one State's monopoly by making purchases in another area or another State. Similarly, in the case of state copyrights, except as to individuals willing to travel across state lines in order to purchase records or other writings protected in their own State, each State's

copyrights will still serve to induce new artistic creations within that State—the very objective of the grant of protection. We do not see here the type of prejudicial conflicts which would arise, for example, if each State exercised a sovereign power to impose imposts and tariffs; [14] nor can we discern a need for uniformity such as that which may apply to the regulation of interstate shipments.[15]

Similarly, it is difficult to see how the concurrent exercise of the power to grant copyrights by Congress and the States will necessarily and inevitably lead to difficulty. At any time Congress determines that a particular category of "writing" is worthy of national protection and the incidental expenses of federal administration, federal copyright protection may be authorized. Where the need for free and unrestricted distribution of a writing is thought to be required by the national interest, the Copyright Clause and the Commerce Clause would allow Congress to eschew all protection. In such cases, a conflict would develop if a State attempted to protect that which Congress intended to be free from restraint or to free that which Congress had protected. However, where Congress determines that neither federal protection nor freedom from restraint is required by the national interest, it is at liberty to stay its hand entirely.[16] Since state protection would not then conflict with federal action, total relinquishment of the States' power to grant copyright protection cannot be inferred.

[14] The Federalist No. 42, p. 305 (B. Wright ed. 1961).

[15] Cf. *Morgan* v. *Virginia*, 328 U. S. 373 (1946); *Bibb* v. *Navajo Freight Lines*, 359 U. S. 520 (1959); *Southern Pacific Co.* v. *Arizona*, 325 U. S. 761 (1945); *Pennsylvania* v. *West Virginia*, 262 U. S. 553 (1923).

[16] For example, Congress has allowed writings which may eventually be the subject of a federal copyright, to be protected under state law prior to publication. 17 U. S. C. § 2.

As we have seen, the language of the Constitution neither explicitly precludes the States from granting copyrights nor grants such authority exclusively to the Federal Government. The subject matter to which the Copyright Clause is addressed may at times be of purely local concern. No conflict will necessarily arise from a lack of uniform state regulation, nor will the interest of one State be significantly prejudiced by the actions of another. No reason exists why Congress must take affirmative action either to authorize protection of all categories of writings or to free them from all restraint. We therefore conclude that, under the Constitution, the States have not relinquished all power to grant to authors "the exclusive Right to their respective Writings."

## B

Petitioners base an additional argument on the language of the Constitution. The California statute forbids individuals to appropriate recordings at any time after release. From this, petitioners argue that the State has created a copyright of *unlimited* duration, in violation of that portion of Art. I, § 8, cl. 8, which provides that copyrights may only be granted "for limited Times." Read literally, the text of Art. I does not support petitioners' position. Section 8 enumerates those powers which have been granted *to Congress;* whatever limitations have been appended to such powers can only be understood as a limit on congressional, and not state, action. Moreover, it is not clear that the dangers to which this limitation was addressed apply with equal force to both the Federal Government and the States. When Congress grants an exclusive right or monopoly, its effects are pervasive; no citizen or State may escape its reach. As we have noted, however, the exclusive right granted by a State is confined to its

borders. Consequently, even when the right is unlimited in duration, any tendency to inhibit further progress in science or the arts is narrowly circumscribed. The challenged statute cannot be voided for lack of a durational limitation.

## III

Our conclusion that California did not surrender its power to issue copyrights does not end the inquiry. We must proceed to determine whether the challenged state statute is void under the Supremacy Clause. No simple formula can capture the complexities of this determination; the conflicts which may develop between state and federal action are as varied as the fields to which congressional action may apply. "Our primary function is to determine whether, under the circumstances of this particular case, [the state] law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines* v. *Davidowitz,* 312 U. S. 52, 67 (1941). We turn, then, to federal copyright law to determine what objectives Congress intended to fulfill.

By Art. I, § 8, cl. 8, of the Constitution, the States granted to Congress the power to protect the "Writings" of "Authors." These terms have not been construed in their narrow literal sense but, rather, with the reach necessary to reflect the broad scope of constitutional principles. While an "author" may be viewed as an individual who writes an original composition, the term, in its constitutional sense, has been construed to mean an "originator," "he to whom anything owes its origin." *Burrow-Giles Lithographic Co.* v. *Sarony,* 111 U. S. 53, 58 (1884). Similarly, although the word "writings" might be limited to script or printed material, it may be interpreted to include any physical rendering of the fruits of creative intellectual or aesthetic labor.

*Ibid.; Trade-Mark Cases,* 100 U. S. 82, 94 (1879). Thus, recordings of artistic performances may be within the reach of Clause 8.

While the area in which Congress *may* act is broad, the enabling provision of Clause 8 does not require that Congress act in regard to all categories of materials which meet the constitutional definitions. Rather, whether any specific category of "Writings" is to be brought within the purview of the federal statutory scheme is left to the discretion of the Congress. The history of federal copyright statutes indicates that the congressional determination to consider specific classes of writings is dependent, not only on the character of the writing, but also on the commercial importance of the product to the national economy. As our technology has expanded the means available for creative activity and has provided economical means for reproducing manifestations of such activity, new areas of federal protection have been initiated.[17]

---

[17] The first congressional copyright statute, passed in 1790, governed only maps, charts, and books. Act of May 31, 1790, c. 15, 1 Stat. 124. In 1802, the Act was amended in order to grant protection to any person "who shall invent and design, engrave, etch or work . . . any historical or other print or prints . . . ." Act of Apr. 29, 1802, c. 36, 2 Stat. 171. Protection was extended to musical compositions when the copyright laws were revised in 1831. Act of Feb. 3, 1831, c. 16, 4 Stat. 436. In 1865, at the time when Mathew Brady's pictures of the Civil War were attaining fame, photographs and photographic negatives were expressly added to the list of protected works. Act of Mar. 3, 1865, c. 126, 13 Stat. 540. Again in 1870, the list was augmented to cover paintings, drawings, chromos, statuettes, statuary, and models or designs of fine art. Act of July 8, 1870, c. 230, 16 Stat. 198.

In 1909, Congress agreed to a major consolidation and amendment of all federal copyright statutes. A list of 11 categories of protected works was provided. The relevant sections of the Act are discussed in the text of our opinion. The House Report on the proposed bill specifically noted that amendment was required because

Petitioners contend that the actions taken by Congress in establishing federal copyright protection preclude the States from granting similar protection to recordings of musical performances. According to petitioners, Congress addressed the question of whether recordings of performances should be granted protection in 1909; Congress determined that any individual who was entitled to a copyright on an original musical composition should have the right to control to a limited extent the use of that composition on recordings, but that the record itself, and the performance which it was capable of reproducing were not worthy of such protection.[18] In

"the reproduction of various things which are the subject of copyright has enormously increased," and that the President has specifically recommended revision, among other reasons, because the prior laws "omit[ted] provision for many articles which, under modern reproductive processes, are entitled to protection." H. R. Rep. No. 2222, *supra*, n. 12, at 1 (quoting Samuel J. Elder and President Theodore Roosevelt).

Since 1909, two additional amendments have been added. In 1912, the list of categories in § 5 was expanded specifically to include motion pictures. The House Report on the amendment noted:

"The occasion for this proposed amendment is the fact that the production of motion-picture photoplays and motion pictures other than photoplays has become a business of vast proportions. The money invested therein is so great and the property rights so valuable that the committee is of the opinion that the copyright law ought to be so amended as to give to them distinct and definite recognition and protection." H. R. Rep. No. 756, 62d Cong., 2d Sess., 1 (1912).

Finally, in 1971, § 5 was amended to include "sound recordings." Congress was spurred to action by the growth of record piracy, which was, in turn, due partly to technological advances. See Hearings on S. 646 and H. R. 6927, *supra*, n. 5, at 4–5, 11 (1971). It must be remembered that the "record piracy" charged against petitioners related to recordings fixed by the original producer prior to Feb. 15, 1972, the effective date of the 1971 Act. See *supra*, at 551–552.

[18] 17 U. S. C. § 1 (e).

support of their claim, petitioners cite the House Report on the 1909 Act, which states:

> "It is not the intention of the committee to extend the right of copyright to the mechanical reproductions themselves, but only to give the composer or copyright proprietor the control, in accordance with the provisions of the bill, of the manufacture and use of such devices." H. R. Rep. No. 2222, 60th Cong., 2d Sess., 9 (1909).

To interpret accurately Congress' intended purpose in passing the 1909 Act and the meaning of the House Report petitioners cite, we must remember that our modern technology differs greatly from that which existed in 1909. The Act and the report should not be read as if they were written today, for to do so would inevitably distort their intended meaning; rather, we must read them against the background of 1909, in which they were written.

In 1831, Congress first extended federal copyright protection to original musical compositions. An individual who possessed such a copyright had the exclusive authority to sell copies of the musical score; individuals who purchased such a copy did so for the most part to play the composition at home on a piano or other instrument. Between 1831 and 1909, numerous machines were invented which allowed the composition to be reproduced mechanically. For example, one had only to insert a piano roll or disc with perforations in appropriate places into a player piano to achieve almost the same results which previously required someone capable of playing the instrument. The mounting sales of such devices detracted from the value of the copyright granted for the musical composition. Individuals who had use of a piano roll and an appropriate instrument had little, if any, need for a copy of the sheet

music.[19] The problems which arose eventually reached this Court in 1908 in the case of *White-Smith Music Publishing Co.* v. *Apollo Co.*, 209 U. S. 1. There, the Apollo Company had manufactured piano rolls capable of reproducing mechanically compositions covered by a copyright owned by appellant. Appellant contended that the piano rolls constituted "copies" of the copyrighted composition and that their sale, without permission, constituted an infringement of the copyright. The Court held that piano rolls, as well as records, were not "copies" of the copyrighted composition, in terms of the federal copyright statutes, but were merely component parts of a machine which executed the composition.[20] Despite the fact that the piano rolls employed the creative work of the composer, all protection was denied.

It is against this background that Congress passed the 1909 statute. After pointedly waiting for the Court's decision in *White-Smith Music Publishing Co.*,[21] Congress determined that the copyright statutes should be amended to insure that *composers of original musical works* received adequate protection to encourage further artistic and creative effort. Henceforth, under § 1 (e),

[19] H. R. Rep. No. 7083, 59th Cong., 2d Sess., pt. 2, p. 2 (1907) (Minority Report).

[20] "After all, what is the perforated roll? The fact is clearly established in the testimony in this case that even those skilled in the making of these rolls are unable to read them as musical compositions, as those in staff notation are read by the performer. . . .

"These perforated rolls are parts of a machine which, when duly applied and properly operated in connection with the mechanism to which they are adapted, produce musical tones in harmonious combination. But we cannot think that they are copies within the meaning of the copyright act." *White-Smith Music Publishing Co.* v. *Apollo Co.*, 209 U. S. 1, 18 (1908).

[21] H. R. Rep. No. 7083, *supra*, n. 19, pt. 1, at 10; pt. 2, at 3–4.

records and piano rolls were to be considered as "copies" of the original composition they were capable of reproducing, and could not be manufactured unless payment was made to the *proprietor of the composition copyright.* The section of the House Report cited by petitioners was intended only to establish the limits of *the composer's* right; composers were to have no control over the recordings themselves. Nowhere does the report indicate that Congress considered records as anything but a component part of a machine, capable of reproducing an original composition [22] or that Congress intended records, as *renderings of original artistic performance,* to be free from state control.[23]

---

[22] This is especially clear from the comment made by the Committee on Patents in regard to a foreign statute which, to some extent, protected performances. The committee stated that the foreign statute "in no way affects the reproduction of such music by phonographs, graphophones, or the ordinary piano-playing instruments, for in these instruments the reproduction is purely mechanical." H. R. Rep. No. 2222, *supra,* n. 12, at 5.

[23] Petitioners do not argue that § 653h conflicts with that portion of 17 U. S. C. § 1 (e) which provides:

"[W]henever the owner of a musical copyright has used or permitted or knowingly acquiesced in the use of the copyrighted work upon the parts of instruments serving to reproduce mechanically the musical work, any other person may make similar use of the copyrighted work upon the payment to the copyright proprietor of a royalty of 2 cents on each such part manufactured . . . ."

Assuming, *arguendo,* that petitioners' use of the composition they duplicated constitutes a "similar use," the challenged state statute might be claimed to diminish the return which is due the composer by lessening the number of copies produced, and thus to conflict with § 1 (e). However, as we have noted above, the means presently available for reproducing recordings were not in existence in 1909 when 17 U. S. C. § 1 (e) was passed. We see no indication that the challenged state statute detracts from royalties which Congress intended the composer to receive. Furthermore, many state statutes may diminish the number of copies produced. Taxing statutes, for

Petitioners' argument does not rest entirely on the belief that Congress intended specifically to exempt recordings of performances from state control. Assuming that no such intention may be found, they argue that Congress so occupied the field of copyright protection as to pre-empt all comparable state action. *Rice* v. *Santa Fe Elevator Corp.*, 331 U. S. 218 (1947). This assertion is based on the language of 17 U. S. C. §§ 4 and 5, and on this Court's opinions in *Sears, Roebuck & Co.* v. *Stiffel Co.*, 376 U. S. 225 (1964), and *Compco Corp.* v. *Day-Brite Lighting*, 376 U. S. 234 (1964).

Section 4 of the federal copyright laws provides:

> "The works for which copyright may be secured under this title shall include all the writings of an author." 17 U. S. C. § 4.

Section 5, which lists specific categories of protected works, adds:

> "The above specifications shall not be held to limit the subject matter of copyright as defined in section 4 of this title . . . ." 17 U. S. C. § 5.

Since § 4 employs the constitutional term "writings," [24] it may be argued that Congress intended to exercise its authority over all works to which the constitutional provision might apply. However, in the more than 60 years which have elapsed since enactment of this provision, neither the Copyright Office, the courts, nor the Congress has so interpreted it. The Register of Copyrights,

---

example, may raise the cost of producing or selling records and thereby lessen the number of records which may be sold or inhibit new companies from entering this field of commerce. We do not see in these statutes the direct conflict necessary to render a state statute invalid.

[24] H. R. Rep. No. 2222, *supra*, n. 12, at 10.

who is charged with administration of the statute, has consistently ruled that "claims to exclusive rights in mechanical recordings . . . or in the performances they reproduce" are not entitled to protection under § 4. 37 CFR § 202.8 (b) (1972).[25] With one early exception,[26] American courts have agreed with this interpretation;[27] and in 1971, prior to passage of the statute which extended federal protection to recordings fixed on or after February 15, 1972, Congress acknowledged the validity of that interpretation. Both the House and Senate Reports on the proposed legislation recognized that recordings qualified as "writings" within the meaning of the Constitution, but had not previously been protected under the federal copyright statute. H. R. Rep. No. 92–487, pp. 2, 5 (1971); S. Rep. No. 92–72, p. 4 (1971). In light of this consistent interpretation by the courts, the agency empowered to administer the copyright stat-

---

[25] The registration of records under the provisions of the 1909 Act would give rise to numerous administrative difficulties. It is difficult to discern how an individual who wished to copyright a record could comply with the notice and deposit provisions of the statute. 17 U. S. C. §§ 12, 13, 19, 20. Nor is it clear to whom the copyright could rightfully be issued or what constituted publication. Finally, the administrative and economic burden of classifying and maintaining copies of records would have been considerable. See Chafee, Reflections on the Law of Copyright; II, 45 Col. L. Rev. 719, 735 (1945); Ringer, The Unauthorized Duplication of Sound Recordings, Studies Prepared for the Subcommittee on Patents, Trademarks, and Copyrights of the Senate Committee on the Judiciary, 86th Cong., 2d Sess., 2 (comm. print 1961); Hearings on S. 646 and H. R. 6927 *supra*, n. 5, at 11, 14.

[26] *Fonotipia, Ltd.* v. *Bradley,* 171 F. 951, 963 (EDNY 1909).

[27] *Aeolian Co.* v. *Royal Music Roll Co.,* 196 F. 926, 927 (WDNY 1912); *Waring* v. *WDAS Broadcasting Station,* 327 Pa. 433, 437–438, 194 A. 631, 633–634 (1937); *Capitol Records, Inc.* v. *Mercury Records Corp.,* 221 F. 2d 657, 661–662 (CA2 1955); *Jerome* v. *Twentieth Century Fox-Film Corp.,* 67 F. Supp. 736, 742 (SDNY 1946).

utes, and Congress itself, we cannot agree that §§ 4 and 5 have the broad scope petitioners claim.

*Sears* and *Compco,* on which petitioners rely, do not support their position. In those cases, the question was whether a State could, under principles of a state unfair competition law, preclude the copying of mechanical configurations which did not possess the qualities required for the granting of a federal design or mechanical patent. The Court stated:

> "[T]he patent system is one in which uniform federal standards are carefully used to promote invention while at the same time preserving free competition. Obviously a State could not, consistently with the Supremacy Clause of the Constitution, extend the life of a patent beyond its expiration date or give a patent on an article which lacked the level of invention required for federal patents. To do either would run counter to the policy of Congress of granting patents only to true inventions, and then only for a limited time. Just as a State cannot encroach upon the federal patent laws directly, it cannot, under some other law, such as that forbidding unfair competition, give protection of a kind that clashes with the objectives of the federal patent laws." *Sears, Roebuck & Co.* v. *Stiffel Co.,* 376 U. S., at 230–231 (footnotes omitted).

In regard to mechanical configurations, Congress had balanced the need to encourage innovation and originality of invention against the need to insure competition in the sale of identical or substantially identical products. The standards established for granting federal patent protection to machines thus indicated not only which articles in this particular category Congress wished to protect, but which configurations it wished to remain free. The application of state law in these cases to pre-

vent the copying of articles which did not meet the requirements for federal protection disturbed the careful balance which Congress had drawn and thereby necessarily gave way under the Supremacy Clause of the Constitution. No comparable conflict between state law and federal law arises in the case of recordings of musical performances. In regard to this category of "Writings," Congress has drawn no balance; rather, it has left the area unattended, and no reason exists why the State should not be free to act.[28]

## IV

More than 50 years ago, Mr. Justice Brandeis observed in dissent in *International News Service* v. *Associated Press:*

> "The general rule of law is, that the noblest of human productions—knowledge, truths ascertained, conceptions, and ideas—become, after voluntary communication to others, free as the air to common use." 248 U. S. 215, 250 (1918).

But there is no fixed, immutable line to tell us which "human productions" are private property and which are so general as to become "free as the air." In earlier times, a performing artist's work was largely restricted to the stage; once performed, it remained "recorded" only in the memory of those who had seen or heard it. Today, we can record that performance in precise detail

---

[28] Petitioners place great stress on their belief that the records or tapes which they copied had been "published." We have no need to determine whether, *under state law,* these recordings had been published or what legal consequences such publication might have. *For purposes of federal law,* "publication" serves only as a term of the art which defines the legal relationships which Congress has adopted under the federal copyright statutes. As to categories of writings which Congress has not brought within the scope of the federal statute, the term has no application.

and reproduce it again and again with utmost fidelity. The California statutory scheme evidences a legislative policy to prohibit "tape piracy" and "record piracy," conduct that may adversely affect the continued production of new recordings, a large industry in California. Accordingly, the State has, by statute, given to recordings the attributes of property. No restraint has been placed on the use of an idea or concept; rather, petitioners and other individuals remain free to record the same compositions in precisely the same manner and with the same personnel as appeared on the original recording.

In sum, we have shown that § 653h does not conflict with the federal copyright statute enacted by Congress in 1909. Similarly, no conflict exists between the federal copyright statute passed in 1971 and the present application of § 653h, since California charged petitioners only with copying recordings fixed prior to February 15, 1972.[29] Finally, we have concluded that our decisions in *Sears* and *Compco,* which we reaffirm today, have no application in the present case, since Congress has indicated neither that it wishes to protect, nor to free from protection, recordings of musical performances fixed prior to February 15, 1972.

We conclude that the State of California has exercised a power which it retained under the Constitution, and that the challenged statute, as applied in this case, does not intrude into an area which Congress has, up to now, pre-empted. Until and unless Congress takes further action with respect to recordings fixed prior to February 15, 1972, the California statute may be enforced against acts of piracy such as those which occurred in the present case.

*Affirmed.*

---

[29] *Supra,* at 551–552.

MR. JUSTICE DOUGLAS, with whom MR. JUSTICE BRENNAN and MR. JUSTICE BLACKMUN concur, dissenting.

Article I, § 8, cl. 8, of the Constitution provides:

"The Congress shall have Power . . . [t]o promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries."

Madison made a brief comment on this provision governing both patents and copyrights:

"The States cannot separately make effectual provision for either of the cases, and most of them have anticipated the decision of this point, by laws passed at the instance of Congress."[1]

We have been faithful to that admonition. In *Sears Roebuck & Co.* v. *Stiffel Co.,* 376 U. S. 225, 230–231, we said:

"Thus the patent system is one in which uniform federal standards are carefully used to promote invention while at the same time preserving free competition. Obviously a State could not, consistently with the Supremacy Clause of the Constitution, extend the life of a patent beyond its expiration date or give a patent on an article which lacked the level of invention required for federal patents. To do either would run counter to the policy of Congress of granting patents only to true inventions, and then only for a limited time. Just as a State cannot encroach upon the federal patent laws directly, it cannot, under some other law, such as that forbidding unfair competition, give protection of a kind

---

[1] The Federalist No. 43, p. 309 (B. Wright ed. 1961).

that clashes with the objectives of the federal patent laws."

An unpatentable article is "in the public domain and may be made and sold by whoever chooses to do so." *Id.*, at 231. In that case we did not allow a State to use its unfair competition law to prevent copying of an article which lacked such novelty that it could not be patented. In a companion case, *Compco Corp.* v. *Day-Brite Lighting*, 376 U. S. 234, 237, where an unfair competition charge was made under state law, we made the same ruling, stating:

"Today we have held in *Sears, Roebuck & Co.* v. *Stiffel Co., supra,* that when an article is unprotected by a patent or a copyright, state law may not forbid others to copy that article. To forbid copying would interfere with the federal policy, found in Art. I, § 8, cl. 8, of the Constitution and in the implementing federal statutes, of allowing free access to copy whatever the federal patent and copyright laws leave in the public domain."

Prior to February 25, 1972, copyright protection was not extended to sound recordings. *Sears* and *Compco* make clear that the federal policy expressed in Art. I, § 8, cl. 8, is to have "national uniformity in patent and copyright laws," 376 U. S., at 231 n. 7, a policy bolstered by Acts of Congress which vest "exclusive jurisdiction to hear patent and copyright cases in federal courts . . . and that section of the Copyright Act which expressly saves state protection of unpublished writings but does not include published writings." *Ibid.*

Prior to February 15, 1972,[2] sound recordings had no

---

[2] The effective date of Pub. L. 92–140, 85 Stat. 392.

copyright protection. And even under that Act the copyright would be effective "only to sound recordings fixed, published, and copyrighted on and after the effective date of this Act [Feb. 15, 1972] and before January 1, 1975." [3]

California's law promotes monopoly; the federal policy promotes monopoly only when a copyright is issued, and it fosters competition in all other instances. Moreover, federal law limits its monopoly to 28 years plus a like renewal period,[4] while California extends her monopoly into perpetuity.

Cases like *Sears* were surcharged with "unfair competition" and the present one with "pirated recordings." But free access to products on the market is the consumer interest protected by the failure of Congress to extend patents or copyrights into various areas. The drive for monopoly protection is strong as is evident from a reading of the committee reports on the 1971 Act.[5] Yet, Congress took but a short step, setting up a trial period to consider the new monopoly approach. It was told that state laws, such as we have in this case, were being challenged on the ground that the Federal Constitution had pre-empted the field, even in absence of a provision for making it possible to obtain a copyright for sound recordings. But the House Committee made only the following comment:

> "While the committee expresses no opinion concerning this legal question, it is clear that the extension of copyright protection to sound recordings would resolve many of the problems which have arisen in

---

[3] *Id.*, § 3.
[4] 17 U. S. C. § 24.
[5] H. R. Rep. No. 92–487; S. Rep. No. 92–72.

connection with the efforts to combat piracy in State courts." [6]

The Department of Justice in commenting on the proposals that resulted in the 1971 Act told the House:

"We believe that extending copyright to reproduction of sound recordings is the soundest, and in our interpretation of *Sears* and *Compco,* the only way in which sound recordings should be protected. Copyright protection is narrowly defined and limited in duration, whereas state remedies, whose validity is still in doubt, frequently create broad and unwarranted perpetual monopolies. Moreover, there is an immediate and urgent need for this protection." [7]

The need for uniformity was stated by Judge Learned Hand in a dissent in *Capitol Records, Inc.* v. *Mercury Records Corp.,* 221 F. 2d 657. That case involved the duplication of uncopyrighted sound recordings, the court holding that state law prevailed where there was no federal copyright provision. Judge Hand emphasized in his dissent that "uniformity" was one of the principal purposes of the Patent and Copyright Clause and that uniformity could be obtained only by pre-emption. He said:

"If, for example in the case at bar, the defendant is forbidden to make and sell these records in New York, that will not prevent it from making and selling them in any other state which may regard the plaintiff's sales as a 'publication'; and it will be practically impossible to prevent their importation into New York. That is exactly the kind of evil at which the clause is directed." *Id.,* at 667.

I would reverse the judgment below.

---

[6] H. R. Rep., *supra,* n. 5, at 3.

[7] *Id.,* at 13.

Mr. Justice Marshall, with whom Mr. Justice Brennan and Mr. Justice Blackmun join, dissenting.

The argument of the Court, as I understand it, is this: Art. I, § 8, cl. 8, of the Constitution gives Congress the power "[t]o promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries." The Framers recognized that individual States might have peculiarly local interests that Congress might not consider worthy of attention. Thus, the constitutional provision does not, of its own force, bar States from promoting those local interests. However, as the Court noted in *Sears, Roebuck & Co.* v. *Stiffel Co.*, 376 U. S. 225 (1964), with respect to every particular item within general classes enumerated in the relevant statutes, Congress had balanced the need to promote invention against the desire to preserve free competition, and had concluded that it was in the national interest to preserve competition as to every item that could not be patented. That is, the fact that some item could not be patented demonstrated that, in the judgment of Congress, it was best to let competition in the production of that item go unrestricted. The situation with regard to copyrights is said to be similar. There Congress enumerated certain classes of works for which a copyright may be secured. 17 U. S. C. § 5. Its silence as to other classes does not reflect a considered judgment about the relative importance of competition and promotion of "Science and useful Arts." Thus, the Court says, the States remain free to protect as they will "writings" not in the enumerated classes, until Congress acts. Since sound recordings fixed prior to February 15, 1972, were not enumerated by Congress as subject to copyrighting,[1] the States may protect such recordings.

---

[1] Sound recordings fixed after that date may be copyrighted. Pub. L. 92–140, 85 Stat. 391, 17 U. S. C. § 5 (n) (1970 ed., Supp. I).

With respect, I cannot accept the final step of this argument. In my view, Congress has demonstrated its desire to exercise the full grant of constitutional power. Title 17 U. S. C. § 4, states: "The works for which copyright may be secured under this title shall include *all the writings of an author*" (emphasis added). The use of the constitutional terms "writings" and "author" rather strongly suggests that Congress intended to follow the constitutional grant. It could exercise the power given it by the Constitution in two ways: either by protecting all writings, or by protecting all writings within designated classes and leaving open to competition all writings in other classes. Section 5 shows that the latter course was chosen, for it enumerates various classes of works that may be registered.[2] Ordinarily, the failure to enumerate "sound recordings" in § 5 would not be taken as an expression of Congress' desire to let free competition reign in the reproduction of such recordings, for, because of the realities of the legislative process, it is generally difficult to infer from a failure to act any affirmative conclusions. Cf. *Cleveland* v. *United States,* 329 U. S. 14, 22 (1946) (Rutledge, J., concurring). But in *Sears* and its companion case, *Compco Corp.* v. *Day-Brite Lighting,* 376 U. S. 234 (1964), the Court determined that with respect to patents and copyrights, the ordinary practice was not to prevail. In view of the importance of not imposing unnecessary restraints on competition, the Court adopted in those cases a rule of construction that, unless the failure to provide patent

---

[2] From the language of § 4 and the proviso of § 5, it could be rather strongly argued that Congress had intended to afford protection to every writing. I agree with the Court, however, that the consistent administrative interpretation of those sections, in conjunction with the practical difficulty of applying to novel cases certain statutory requirements, like that requiring placement of the notice of copyright on every copy, 17 U. S. C. § 10, precludes such an argument.

or copyright protection for some class of works could clearly be shown to reflect a judgment that state regulation was permitted, the silence of Congress would be taken to reflect a judgment that free competition should prevail. I do not find in *Sears* and *Compco* a limitation on that rule of construction to general classes that Congress has enumerated although, of course, on the facts of those cases only items in such classes were involved; rather, the broadest language was used in those cases.[3] Nor can I find in the course of legislation sufficient evidence to convince me that Congress determined to permit state regulation of the reproduction of sound recordings. For, whenever technological advances made extension of copyright protection seem wise, Congress has acted promptly. See *ante,* at 562–563, n. 17.[4] This seems to me to reflect the same judgment that the Court found in

---

[3] It bears noting that in *Sears, Roebuck & Co.* v. *Stiffel Co.,* 376 U. S. 225 (1964), the Court repeatedly referred to the patent and copyright statutes as if the same rules of interpretation applied to both. See, *e. g., id.,* at 228, 231 n. 7; *Compco Corp.* v. *Day-Brite Lighting,* 376 U. S. 234, 237 (1964).

[4] Between 1909 and 1951, Congress' attention was repeatedly drawn to problems of copyrighting sound recordings. Many bills to provide copyright protection for such recordings were introduced, but none were enacted. See Ringer, The Unauthorized Duplication of Sound Recordings, Studies Prepared for the Subcommittee on Patents, Trademarks, and Copyrights of the Senate Committee on the Judiciary, 86th Cong., 2d Sess., 21–37 (Comm. Print 1961). Respondent argues that Congress failed to enact these bills primarily out of uncertainty about the relationship between federal law and international copyright conventions, and was comforted in the knowledge that protection was available under state law. See Brief for Respondent 28–32. However, it is enough that Congress was aware of the problem, and could have acted, as it did when other technological innovations presented new problems, rather expeditiously. The problems that Congress confronted in 1971 did not spring up in 1970, but had existed, and Congress had not acted, for many years before.

*Sears* and *Compco:* Congress has decided that free competition should be the general rule, until it is convinced that the failure to provide copyright or patent protection is hindering "the Progress of Science and useful Arts."

The business of record piracy is not an attractive one; persons in the business capitalize on the talents of others without needing to assess independently the prospect of public acceptance of a performance. But the same might be said of persons who copy "mechanical configurations." Such people do provide low-cost reproductions that may well benefit the public. In light of the presumption of *Sears* and *Compco* that congressional silence betokens a determination that the benefits of competition outweigh the impediments placed on creativity by the lack of copyright protection, and in the absence of a congressional determination that the opposite is true, we should not let our distaste for "pirates" interfere with our interpretation of the copyright laws. I would therefore hold that, as to sound recordings fixed before February 15, 1972, the States may not enforce laws limiting reproduction.