197 F.3d 1284 (9th Cir. 1999)
 GEORGE WENDT, an individual; JOHN RATZENBERGER, an individual, PlaintiffsAppellants,
v.
HOST INTERNATIONAL, INC., a Delaware corporation, Defendant-Appellee, and PARAMOUNT PICTURES, CORPORATION, a Delaware corporation, Defendant-Intervenor.
 No. 96-55243
 U.S. Court of Appeals for the Ninth Circuit
 December 28, 1999
 
 1
 Before: Betty B. Fletcher and Stephen S. Trott, Circuit Judges, and Bruce S. Jenkins,[1] District Judge.
 
 
 2
 Order; Dissent by Judge KOZINSKI.
 
 Prior Report: 125 F.3d 806
 ORDER
 
 3
 The panel has voted to deny the petition for rehearing. Judge Trott voted to reject the petition for rehearing en banc and Judges B. Fletcher and Jenkins so recommend.
 
 
 4
 The full court was advised of the petition for rehearing en banc. An active Judge requested a vote on whether to rehear the matter en banc. The matter failed to receive a majority of the votes in favor of en banc consideration. Fed. R. App. P. 35.
 
 
 5
 The petition for rehearing is denied and the petition for rehearing en banc is rejected.
 
 
 
 Notes:
 
 
 [1]
 Honorable Bruce S. Jenkins, Senior United States District Judge for the District of Utah, sitting by designation.
 KOZINSKI, Circuit Judge, with whom Judges KLEINFELD and TASHIMA join, dissenting from the order rejecting the suggestion for rehearing en banc:
 Robots again. In White v. Samsung Elecs. Am., Inc., 971 F.2d 1395, 1399 (9th Cir. 1992), we held that the right of publicity extends not just to the name, likeness, voice and signature of a famous person, but to anything at all that evokes that person's identity. The plaintiff there was Vanna White, Wheel of Fortune letter-turner extraordinaire; the offending robot stood next to a letter board, decked out in a blonde wig, Vanna-style gown and garish jewelry. Dissenting from our failure to take the case en banc, I argued that our broad application of the right of publicity put state law on a collision course with the federal rights of the copyright holder. See 989 F.2d 1512, 1517-18 (9th Cir. 1993).
 The conflict in White was hypothetical, since the defendant (Samsung) did not have a license from the Wheel of Fortune copyright holder. Here it is concrete: The panel holds that licensed animatronic figures based on the copyrighted Cheers characters Norm and Cliff infringe on the rights of the actors who portrayed them. As I predicted, White's voracious logic swallows up rights conferred by Congress under the Copyright Act.
 
 
 *
 Though a bit dated now, Cheers remains near and dear to the hearts of many TV viewers. Set in a friendly neighborhood bar in Boston, the show revolved around a familiar scene. Sam, the owner and bartender, entertained the boys with tales of his glory days pitching for the Red Sox. Coach piped in with sincere, obtuse advice. Diane and Frasier chattered self-importantly about Lord Byron. Carla terrorized patrons with acerbic comments. And there were Norm and Cliff, the two characters at issue here. Norm, a fat, endearing, oft-unemployed[1] accountant, parked himself at the corner of the bar, where he was joined by Cliff, a dweebish[2] mailman and something of a know-it-all windbag.[3] After eleven years on the air, the gang at Cheers became like family to many fans, ensuring many more years in syndication. See Gebe Martinez, "Cheers" Fans Cry in Their Beers as Sitcom Ends Long Run, L.A. Times, May 21, 1993, at B1.
 Defendant Host International decided to tap into this keg of goodwill. After securing a license from Paramount, the copyright holder, Host opened a line of Cheers airport bars. To help get patrons into a Cheers mood, Host populated the bars with animatronic figures[4] resembling Norm and Cliff: One is fat; the other is dressed as a mailman.[5]
 Plaintiffs George Wendt and John Ratzenberger, the only actors who ever portrayed Norm and Cliff, sued Host for unfair competition and violation of their right of publicity. Paramount intervened, claiming that its copyright preempted any claim Wendt and Ratzenberger might have under state law. The district court granted summary judgment for the defendants because it found that the robots didn't look like the plaintiffs: "[T]here is [no] similarity at all . . . except that one of the robots, like one of the plaintiffs, is heavier than the other . . . . The facial features are totally different." 125 F.3d at 809. Relying on White, the panel here reverses but offers little explanation beyond the curt assertion that "material facts exist that might cause a reasonable jury to find[the robots] sufficiently `like' [Wendt and Ratzenberger ] to violate" their right of publicity. Id. at 810.
 II
 This case, unlike White, pits actor against copyright holder. The parties are fighting over the same bundle of intellectual property rights--the right to make dramatic representations of the characters Norm and Cliff. Host and Paramount as sert their right under the Copyright Act to present the Cheers characters in airport bars; Wendt and Ratzenberger assert their right under California law to control the exploitation of their likenesses. But to millions of viewers, Wendt and Ratzenberger are Norm and Cliff; it's impossible to exploit the latter without also evoking thoughts about the former.
 So who wins? The Copyright Act makes it simple, at least insofar as the plaintiffs interfere with Paramount's right to exploit the Cheers characters. Section 301 of the Copyright Act preempts any state law "legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright[.]" 17 U.S.C. S 301(a). The copyright to Cheers carries with it the right to make derivative works based on its characters. See generally Warner Bros., Inc. v. American Broadcasting Cos., 720 F.2d 231, 235 (2d Cir. 1983) (Superman copyright belongs to Warner Brothers). The presentation of the robots in the Cheers bars is a derivative work, just like a TV clip, promotion, photograph, poster, sequel or dramatic rendering of an episode. Thus, under federal law, Host has the unconditional right to present robots that resemble Norm and Cliff.
 Instead, the panel allows the plaintiffs to pick up where Vanna left off: Copyright or no copyright, anyone who wants to use a figure, statue, robot, drawing or poster that reminds the public of Wendt and Ratzenberger must first obtain (and pay for) their consent. This cannot be squared with the right of the copyright holder to recreate Norm and Cliff however it sees fit. At the very least, Paramount must be able to reproduce the characteristics that bring Norm and Cliff to mind.
 The problem lies with the sweeping standard we adopted in White. The right of publicity, as defined by the state courts, is limited to using a celebrity's name, voice, face or signature. See, e.g., Stephano v. News Group Publications, Inc., 474 N.E.2d 580, 583-84 (N.Y. 1984) (finding right of publicity under New York law limited to statutory protection of "name, portrait or picture"); Lugosi v. Universal Pictures, 25 Cal. 3d 813, 828 (1979) (Mosk, J., concurring) ("If Bela Lugosi were alive today, he would be unable to claim an invasion of his right to privacy for Universal's exploitation . . . of products created in the image of Count Dracula, a role Lugosi played."). A copyright holder can generally avoid using any of these tangible elements in exploiting its copyright. White exploded the right of publicity to include anything that brings the celebrity to mind. See White, 971 F.2d at 1399. It's inevitable that so broad and ill-defined a property right will trench on the rights of the copyright holder. According to the panel, Paramount and Host may not use Norm and Cliff in a way that reminds people of the actors who played them and whose identity is therefore fused in the public mind. This is a daunting burden. Can Warner Brothers exploit Rhett Butler without also reminding people of Clark Gable? Can Paramount cast Shelley Long in The Brady Bunch Movie without creating a triable issue of fact as to whether it is treading on Florence Henderson's right of publicity? How about Dracula and Bela Lugosi? Ripley and Sigourney Weaver? Kramer and Michael Richards?
 When portraying a character who was portrayed by an actor, it is impossible to recreate the character without evoking the image of the actor in the minds of viewers. Suppose the Seinfeld minions create a spin-off called Kramer. One of the Seinfeld characters was Newman, a fat mailman. Suppose Wayne Knight--the actor who played Newman--won't do Kramer. So Kramer brings in someone else to play Newman, a corpulent actor who (when dressed as a mailman) reminds people of Wayne Knight. What happens when Knight sues? Under White and the panel decision here, Knight can go to trial on a claim that the new Newman evokes his (Knight's) identity, even though Castle Rock owns the rights to make derivative works based on Seinfeld. It would be no defense that everyone knows the new actor is not Wayne Knight; no one, after all, thinks the robots here or in White were, in fact, Wendt, Ratzenberger or White. So long as the casting director comes up with a new Newman who reminds the public of the old Newman (i.e. Knight), Knight has a right-of-publicity claim that will at least survive summary judgment. Under the unbounded right of publicity announced in White , copyright holders will seldom be able to avoid trial when sued for infringement of the right to publicity. Remember Vanna: Even though the robot looked nothing like her, a jury awarded her $400,000. See Vanna White Wins Suit, Wall St. J., Jan. 24, 1994, at B2.[6]
 III
 The panel's refusal to recognize copyright preemption puts us in conflict with the Seventh Circuit in Baltimore Orioles, Inc. v. Major League Baseball Players Ass'n, 805 F.2d 663 (7th Cir. 1986). Baltimore Orioles held that the baseball clubs --not the players--own the rights to baseball telecasts under copyright law, and the players can't use their state law right of publicity to veto the telecast of their performance. This was so even though the telecast (obviously) used the players' identities and likenesses.
 The Seventh Circuit acknowledged that the state law right of publicity gave the players a property interest in their actual performances, see Zacchini v. Scripps-Howard Broadcasting Co., 433 U.S. 562 (1977), but held that this right could not trump the Clubs' right under the Copyright Act to control the telecast. See 805 F.2d at 678-79. The Seventh Circuit recognized, as the panel here does not, that the players and the clubs were fighting over the same bundle of intellectual property rights:
 In this litigation, the Players have attempted to obtain ex post what they did not negotiate ex ante. That is to say, they seek a judicial declaration that they possess a right--the right to control the tele casts of major league baseball games--that they could not procure in bargaining with the Clubs.
 Id. at 679. The clubs owned both the right to sell tickets to see the games and the copyright to the telecast. The copyright preempted whatever state law rights the players claimed, at least insofar as state law would prevent ordinary use of the copyrighted work. See also Fleet v. CBS, Inc., 50 Cal. App. 4th 1911, 1920-21 (1996). The same reasoning applies here: The plaintiffs' right to control the use of their likeness is preempted by Paramount's right to exploit the Norm and Cliff characters however it sees fit. If Wendt and Ratzenberger wanted to control how the Cheers characters were portrayed after they left the show, they should have negotiated for it beforehand.[7]
 IV
 Coming home to roost is yet another problem I warned about in White--that a broad reading of the state right of publicity runs afoul of the dormant Copyright Clause, which preempts state intellectual property laws to the extent they "prejudice the interests of other States." Goldstein v. California, 412 U.S. 546, 558 (1973). Just as a state law regulating the length of trucks is invalid under the dormant Commerce Clause if it poses an undue burden on interstate commerce, see Kassel v. Consolidated Freightways Corp. , 450 U.S. 662, 674 (1981), so California's right of publicity law is invalid if it substantially interferes with federal copyright law, even absent preemptive legislation.
 
 
 A
 copyright licensee must be able to exercise rights which are inherently federal in nature without worrying that 50 separate states will burden those rights. This is most obviously true when state law restricts the display of derivative works outside the borders of its state. Compare Goldstein, 412 U.S. at 558. Yet that is exactly what the panel approves here: Plaintiffs are using California law to stop Host from displaying a copyrighted work in Kansas City and Cleveland. Why California should set the national standard for what is a permissible use of a licensed derivative work is beyond me. Rather than construe the right of publicity narrowly to avoid this constitutional conundrum, see Crowell v. Benson, 285 U.S. 22, 62 (1932), the panel compounds White 's errors by enforcing California's right of publicity way beyond California's borders
 
 
 V
 
 The First Amendment concerns raised by White are even more pressing here. White was an advertisement and therefore subject to the less demanding commercial speech standard of Central Hudson Gas & Elec. Corp. v. Public Serv. Comm., 447 U.S. 557, 561-63 (1980). Here, the portrayal of the Cheers characters is core protected speech: Using Norm and Cliff dummies in a Cheers-themed bar is a dramatic presentation.[8] It's like a play. Cheers may not have the social impact of Hair, see Southeastern Promotions, Ltd. v. Conrad, 420 U.S. 546 (1975), but it's a literary work nonetheless, worthy of the highest First Amendment protection from intrusive state laws like California's right-of-publicity statute. See Cardtoons, L.C. v. Major League Baseball Players Ass'n, 95 F.3d 959, 970-72 (10th Cir. 1996). Host did not plaster Wendt's face on a billboard with a Budweiser logo. It cashed in on the Cheers goodwill by creatively putting its familiar mise-en-scene to work. The robots are a new derivation of a copyrighted work, not unlike a TV series based on a movie or a Broadway play based on a novel. The novelty of using animatronic figures based on TV characters ought to prick up our ears to First Amendment concerns. Instead we again let the right of publicity snuff out creativity.
 VI
 As I noted in White, "No California statute, no California court has actually tried to reach this far. It is ironic that it is we who plant this kudzu in the fertile soil of our federal system." 989 F.2d at 1519. We pass up yet another opportunity to root out this weed. Instead, we feed it Miracle-Gro. I dissent.
 Notes:
 
 
 [1]
 Sam: "Hey, what's happening, Norm?" Norm: "Well, it's a dog-eat-dog world, and I'm wearing Milk Bone underwear."
 
 
 [2]
 "There's no rule against postal workers not dating women. It just works out that way."
 
 
 [3]
 "It's a little known fact that the tan became popular in what is known as the Bronze Age."
 
 
 [4]
 As best the record discloses, these are life-size stuffed dolls that move somewhat and play pre-recorded quips.
 
 
 [5]
 In a half-hearted attempt to avoid litigation, Host changed the robots' names to "Hank" and "Bob."
 
 
 [6]
 To avoid going to trial in such a situation, producers will have to cast new actors who look and sound very different from the old ones. A Seinfeld spin-off thus ends up in a bizarro world where a skinny Newman sits down to coffee with a svelte George, a stocky Kramer, a fat Jerry and a lanky blonde Elaine. Not only is goodwill associated with the old show lost, the artistic freedom of the screenwriters and producers is severely cramped.
 
 
 [7]
 The Seventh Circuit is not alone in recognizing the need to limit the right of publicity. See, e.g., Allison v. Vintage Sports Plaques, 136 F.3d 1443, 1447-49 (11th Cir. 1998) (recognizing first sale doctrine as limiting right of publicity). Scholars, too, have soundly rejected White. See Arlen W. Langvardt, The Troubling Implications of a Right of Publicity "Wheel" Spun Out of Control, 45 U. Kan. L. Rev. 329 (1997); Stephen R. Barnett, First Amendment Limits on the Right of Publicity, 30 Tort & Ins. L.J. 635 (1995); Steven C. Clay, Starstruck: The Overextension of Celebrity Publicity Rights in State and Federal Courts, 79 Minn. L. Rev. 485 (1994); Jeff Sanders, By Force of Persona: How the Right of Publicity Undermines the First Amendment, 28 Beverly Hills B. Ass'n J. 13 (1994). Even our treatment of Wendt and Ratzenberger's claim has already been criticized. See Felix H. Kent, Right of Privacy and of Publicity, N.Y.L.J., Dec. 19, 1997, at 3; Recent Case, 17 No. 4 Ent. L. Rep. 17 (1995).
 
 
 [8]
 No doubt the decision to put animatronic Norm and Cliff figures in the bars was profit-driven. But that doesn't mean Central Hudson applies: The Supreme Court limits the outhouse of commercial speech to pure advertising--speech that does no more than propose a commercial transaction. Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc., 425 U.S. 748, 762 (1976); Nordyke v. Santa Clara County, 110 F.3d 707, 710 (9th Cir. 1997); Cardtoons, L.C. v. Major League Baseball Players Ass'n, 95 F.3d 959, 970 (10th Cir. 1996).